OHIO UNIVERSITY, Appellee,

v.

OHIO CIVIL RIGHTS COMMISSION et al., Appellants.

[Cite as *Ohio Univ. v. Ohio Civ. Rights Comm.*, 175 Ohio App.3d 414, 2008-Ohio-1034.]

Court of Appeals of Ohio,
Fourth District, Athens County.

No. 07CA7.

Decided March 5, 2008.

416

418

Gerald Mollica, for appellee.

Marc Dann, Attorney General, and Patrick M. Dull, Assistant Attorney General, for appellant Ohio Civil Rights Commission.

Kathaleen B. Schulte and Frederick M. Gittes, for appellant Dr. Robert Lipset.

ABELE, Presiding Judge.

{¶ 1} This is an appeal from an Athens County Common Pleas Court judgment that reversed the final order of the Ohio Civil Rights Commission ("commission"). The commission determined that Ohio University unlawfully denied Dr. Robert Lipset promotion and tenure due to his age. The commission and Dr. Lipset,[1] appellants herein, raise the following assignments of error for review:

---

1. Dr. Lipset adopted the commission's appellate brief and did not file a separate appellate brief.

First Assignment of Error:

The court of common pleas abused its discretion when it held that the final order of the Ohio Civil Rights Commission was unsupported by reliable, probative, and substantial evidence.

Second Assignment of Error:

The court of common pleas abused its discretion when it re-weighed the evidence that was originally presented during the commission's administrative hearing.

Third Assignment of Error:

The court of common pleas abused its discretion when it labeled age-related comments as "stray remarks," and then disregarded the comments as irrelevant.

Fourth Assignment of Error:

The court of common pleas abused its discretion when it imposed an additional requirement on the commission's ability to prove an age discrimination claim— that the underlying victim of discrimination recognize and complain of the age discrimination.

Fifth Assignment of Error:

The court of common pleas abused its discretion when it attributed arguments to the commission that the commission did not present, and then materially faulted the commission for offering no evidence to support those arguments.

## I

## BACKGROUND

{¶ 2} On January 1, 1995, Ohio University hired 45–year old Dr. Robert Lipset as an assistant professor in the Industrial and Manufacturing Systems Engineering ("IMSE") Department. In December 2000, Lipset submitted his case for promotion and tenure. By letter dated January 23, 2001, the promotion and tenure committee informed Lipset that it would not recommend promotion and tenure. The committee chair, Dr. David Koonce, explained the committee's reasons for declining to recommend Lipset for promotion and tenure:

> [I]n reviewing your dossier with respect to research and scholarship, the committee had significant reservations about your commitment to funded research and your progress towards an identifiable personal research track. They were most concerned with the fact that your dossier contains no current research proposals or funding. Historically, your proposals were sent to a very limited number of funding agencies. The committee felt that you should have pursued other funding sources from a wider variety of funding agencies. The

committee also felt that you needed some evidence of individual research, since your dossier shows that all your publications as a faculty member were co-authored with Dr. Van Til, your Ph.D. advisor, or Dr. Judd. In addition, the committee observed that, with one exception, your latter papers were all co-authored with graduate students under the direction of Dr. Judd, as opposed to graduate students under your direction. The committee saw this as a major weakness in your case. Lastly, the committee felt that you had too few articles published in professional journals.

Koonce noted that the committee "deemed" Lipset's teaching and service record "excellent," but the promotion and tenure guidelines state that "a deficiency in one category cannot be outweighed by superior performance in one or both of the other categories."

{¶ 3} Lipset appealed his promotion and tenure denial under university procedures, but his appeal proved unsuccessful. Lipset's last day of employment was June 8, 2002.

{¶ 4} On July 3, 2002, Lipset filed an affidavit with the commission. The commission investigated the charge and found probable cause that Ohio University had engaged in unlawful employment practices in violation of R.C. 4112.02(A). On June 12, 2003, the commission issued a complaint and alleged that Ohio University failed and refused to promote Lipset, failed and refused to offer him tenure, and terminated him for reasons not applied equally to all persons without regard to age.

## A

### EVIDENCE AND TESTIMONY

{¶ 5} On January 22, 2004, a commission hearing officer conducted a public hearing to consider the complaint. At the hearing, Lipset testified regarding various age-related comments that he had heard during his employment at Ohio University. Lipset stated that on one occasion in 1999, Koonce referred to him and some of the retired faculty as "legacies," a term Koonce had previously used to refer to old and outdated computer software. In 1997, Koonce informed Lipset that female graduate students chose Lipset as their advisor because they felt safe with him, as he was old enough to be their father. On another unspecified occasion, Koonce asked Lipset the age of his children. When Lipset told him his son's age, Koonce stated, "Oh, he's just about the same age as I am." Lipset testified that several times Koonce subsequently referred to him as "dad."

{¶ 6} Lipset also testified that he felt "there was an attitude within the [IMSE department] that believed that there was some magical quality to youth in faculty and made them very, very important." He referred to an April 24, 1998 e-mail

from Dr. Charles Parks, the chair of the IMSE department, that had announced the hiring of two new faculty members: "[W]e are fortunate to have two new bright and young faculty to start the fall quarter." Lipset also referred to a letter thanking him for a monetary gift to the IMSE department, in which Parks stated, "We also have an exciting group of young faculty interested in computer applications to manufacturing." This letter, apparently a form letter sent to donors, also stated: "Dr. Robert Lipset joined us in January 1995 from Oakland University. He has over fifteen years experience in automobile manufacturing."

{¶ 7} Lipset stated that he believed that the promotion and tenure committee's collaborative research excuse was "bogus." He testified that no one told him that a condition of promotion and tenure was individual, as opposed to collaborative, research. He related his understanding that "collaborative research was not only desirable, but it was expected."

{¶ 8} Parks testified that in his annual evaluations, he advised Lipset to develop sponsored research programs. To refute Lipset's claim of age discrimination, Parks noted that Lipset's replacement was 47 when Ohio University hired him and that the IMSE department has since tenured two faculty members over the age of 40.

{¶ 9} Koonce testified that the committee had denied Lipset tenure because "his research area was significantly weaker than our expectations would have been." He more specifically explained: "There was a significant lack of * * * external funding and the pursuit of external funding, which is one of the criteria is to have external sponsors sponsor your research and fund graduate students and * * * your time in conducting that research. We also found that there was a—limited independent research on his part and that he had conducted all of his research with other senior faculty." Koonce stated that "without any independent research on [his] own [the committee wasn't] able to determine if [he] ha[d] abilities and skills to conduct research." Koonce additionally explained that Lipset's letters of recommendation were not overly positive. He stated that one was "a very strong letter of support. But the rest were * * * either weak or would not comment." Koonce stated that Lipset's research paper award "showed that he definitely was able to write quality journal publications."

{¶ 10} Koonce denied Lipset's claim that age was a factor in the committee's decision. Koonce recognized Lipset's claim that Koonce's case for promotion and tenure was arguably weaker than Lipset's case, but stated that his research record was stronger because he "had several papers that were published with [his] graduate students only and not the students of other faculty or with other faculty." He also believed that his funded research record "was stronger in terms of even though numerically we both had one large grant and his was a single year grant, mine was a multi-year grant over three years, which was about

$330,000 compared to his which I believe was a single year grant of about $50,000." Koonce further stated that in contrast to Lipset, at the time of his tenure process he had "six individual research initiatives that [he] was applying to or working with external contacts on including one that was subsequently funded shortly after [his] tenure for about a million dollars." Koonce stated that he "was aggressively seeking research," and that when he looked at Lipset's dossier, he "saw one small proposal and no real search for research beyond that." Koonce stated that Lipset's lack of proposals "was a significant weakness that [the committee] just could not overcome in [its] voting."

{¶ 11} Koonce further testified that Lipset rejected an offer to work on one of the projects of Dr. Robert Judd (a professor of engineering). Koonce explained: "Dr. Judd had recently completed a sabbatical at G.E. Aircraft Engines and had subsequent to that secured a quite large research project * * *. Dr. Judd apparently contacted Dr. Lipset and asked if he would be interested. And [Dr. Lipset] apparently declined. * * * [Dr. Lipset] said, you know, Judd asked me to work on this project, but I just don't think I can work with him any more; it will probably cost me tenure."

{¶ 12} Dr. Kendree Sampson, one of the promotion and tenure committee members, testified that Lipset's research did not meet the minimum standards. He explained that the research element comprises three main components: "[T]he refereed publications that the candidate has authored, the record of proposal submission—grant proposal and funding, and the outside of the college recommendation letters that the candidate has received." Sampson stated that in the first area, Lipset had a "substantial number of refereed publication. However, there was considerable concern regarding the fact that none of them were apparently due to his and his graduate students' efforts. * * * [T]he other works were collaborative in nature and the other—at least one author appeared to be a senior member of that group." Sampson stated that Lipset did not have refereed publications with only Lipset and his graduate students as authors. Sampson testified that the committee could not determine whether Lipset "ever took * * * the leadership role in the work" and that it "was a serious shortcoming."

{¶ 13} Sampson additionally explained that Lipset had a "totally inadequate number of proposals submitted" and that his lack of proposals was the most important factor in denying him promotion and tenure. He stated: "[T]here is an expectation that candidates for tenure will establish a reputation among at least—in a national scene where other researchers in his area or her area are able to comment upon the quality of the research that the candidate has performed." Sampson testified that Lipset did not submit recommendation letters from tenured professors at other universities.

{¶ 14} Dr. Lonnie Welch,[2] also a member of the promotion and tenure committee, stated that he saw a downward trend in Lipset's research proposals, and it looked like he "was slacking off even before getting tenure and that it wasn't likely that there would be a sustained productivity if [the committee] were to give tenure to the individual." Welch stated that Lipset had only a small number of proposals per year. Welch further stated that in comparing Lipset's research projects and proposals to Koonce's and Gerth's, he found a "big difference." He explained that Koonce wrote many proposals, and four were funded, and Gerth had a sustained level of proposals, and five were funded. In contrast, Lipset had one proposal funded.

{¶ 15} Dr. Dennis Irwin, Dean of the College of Engineering and Technology, stated that he felt the decision to deny Lipset promotion and tenure was "on the margin." Irwin believed that Lipset had a stronger case than Gerth for promotion and tenure.

{¶ 16} Dr. Judd, a professor of engineering, stated that he thought Lipset's research record met the "minimum research criteria for the college," but admitted that others could conclude that his research "was not significant enough."

{¶ 17} In addition to the foregoing testimony, the parties submitted the following evidence:

1

Awards/Merit Raise

{¶ 18} In the 1996–1997 academic year, Lipset received the "Russ Outstanding Undergraduate Teaching Award." Additionally, in the 1998–1999 academic year, he received the outstanding undergraduate research paper award, and in 1999, he received the IMSE department research award.

{¶ 19} In 2000, the Annual Salary Raise Committee proposed giving Lipset the highest merit-based salary increase among the IMSE department. His raise was proposed to be 3.42%, while the lowest raise was proposed to be 3.06%. In proposing the raises, the committee stated: (1) "The annual raise would be based on merit in teaching, research, and service for each faculty"; (2) "The committee considered only major components (due to limited time frame) of activities in those areas: number of courses taught, course evaluations, research projects amount, number of submitted proposals, journal papers, and committees"; (3) "The committee decided that the range of salary increases would be between 3.0% and 3.5% due to very similar achievements of all faculty members." In

---

2. Welch sat on a reconstituted committee after the faculty senate directed the committee to reconsider its decision to deny Lipset promotion and tenure. Welch replaced Dr. Gerth.

calculating the merit raises, "the committee ranked all faculty members for each of three areas, and computed averages from those as proposed raise levels."

## 2

### Annual Evaluations

{¶ 20} Parks's annual evaluations between 1996 and 1998 were generally favorable and advised Lipset to "continue to focus special attention and make a special effort to balance your efforts in teaching, proposal writing and publication of your research efforts in archival (refereed) journals." Parks's 1999 evaluation pointed out some specific areas for improvement: "While your publication record shows much activity, the record is unbalanced toward conference proceedings. I suggest that you focus more effort on writing peer reviewed archival journal articles." Regarding Lipset's proposals, Parks stated:

> I commend your effort to develop and submit another NSF Careers proposal, an NSF unsolicited proposal and your participation with the Tinker AFB white paper effort. However, since you are not having much success with NSF, you should expand your proposal writing efforts to other funding sources. You can utilize the offices of sponsored research to identify other potential sponsoring agencies. Your consulting activity with Chrysler is commendable and indicates that you are able to perform successfully as an engineer in the "real world."

{¶ 21} Parks's 1999 evaluation also cautioned Lipset that his lack of sponsored research "might pose a serious problem" for his promotion and tenure case. He stated: "Notwithstanding your previously cited proposal writing efforts, my sense is that you are not being aggressive enough in seeking and obtaining sponsored research. Based upon recent P & T decisions rendered here at the college, this sponsored research deficiency might pose a serious problem for your P & T case."

{¶ 22} In Parks's 2000 evaluation, he again recommended that Lipset "expand [his] proposal writing efforts to other funding sources." Parks stated that Lipset's "scholarly publication record is acceptable," but "a modern engineering program requires that faculty develop an entrepreneurial vision for developing sponsored programs."

## 3

### Promotion and Tenure Guidelines

{¶ 23} The promotion and tenure guidelines contain three categories: teaching effectiveness, scholarly activities, and other services. Regarding scholarly activities, the guidelines state:

This department considers relevant and ongoing scholarly activity to be essential for the professional development of its faculty. Evidence of such scholarly performance is to be sought in areas of publications such as books; chapters in published books; published research reports; articles in refereed journals; efforts and works judged by the community of experts in the discipline to be appropriate and worthwhile; conference papers presented and/or published in conference proceedings; articles in representative technical and trade publications; presentation of invited papers; professional recognition or honors; research activities such as procurement and direction of research grants or contracts; development of research equipment, research software, and research laboratories; participation in interdepartmental research; supervision of non-thesis projects, master's theses, and Ph.D. dissertations; participation on non-thesis projects, master thesis, and Ph.D. dissertation committees; participation in faculty development efforts such as short courses and technical seminars; and consulting. The merits and nature of relevant scholarly activity will be assessed in the context of that which commands the respect of other faculty in the department, the faculty of similar departments of other institutions, and research leaders in the relevant fields of practice.

An updated version of the guidelines states:

The principal functions of a faculty member * * * are: transmitting analysis and design skills through effective teaching and training, advancing engineering and technology through creative research/scholarly activities, and service to Ohio University and the faculty member's profession. Faculty members are expected to engage in all of these interrelated functions. However, the relative weighting of these functions in determining promotion and/or tenure is not necessarily the same for every faculty member or every department. The candidate's balance of development and total contribution to the Department and College is what is considered in the final decision.

The revised guidelines also discuss "research and scholarly accomplishments":

Research/scholarly performance is an important factor in the consideration of promotion and the granting of tenure. Judgments of research/scholarly accomplishments are based upon recognition given to these works by appropriate experts outside the College. Research/scholarly accomplishments include publications of journal papers, refereed publications and books, success in the procurement and performance of research grants and contracts, patents received, number and quality of theses and dissertations directed, peer reviews of research work and other work considered to be appropriate. Research/scholarly accomplishments also can result in changes in engineering practice and improved products. The Russ College of Engineering and Technology recognizes that engineering research/scholarly accomplishments are typically accom-

plished through team efforts; consequently, collaboration with colleagues within and outside the University in accomplishing research is valued. For promotion to Professor, in instances where a majority of a candidate's research/scholarly activity is collaborative in nature, the candidate must demonstrate leadership in collaboration.

### 4

### Lipset's Dossier

{¶ 24} Under the section titled "Sponsored Research Projects and Grants," Lipset listed one project during the 1999–2000 year. He also listed three grants: (1) one for the 1996–1997 year, (2) one for the 1997–1998 year, and (3) one for the 1998–1999 year. He listed a fourth grant with an unspecified year that was an equipment donation.

{¶ 25} Under his proposals section, Lipset listed seven proposals that he requested from 1995 to 1999. All but one of the proposals were rejected.

### 5

### Letters of Recommendation

{¶ 26} Dr. Thomas Lacksonen's letter of recommendation answered some specific questions regarding Lipset's research that Koonce apparently requested him to address. Lacksonen wrote:

> To answer your specific questions, Dr. Lipset's research has significance and depth. His publications are in outstanding journals and he has a solid reputation of presenting sound research results at the conferences. Yes, he has a vision for the future. His industry contacts have guided him to useful topics such as deadlock detection and PLC emulation which have practical industrial applications. Yes, his career is based on an upward trajectory. His productivity in terms of papers, presentations, funding, and students started slowly but are clearly increasing in the last few years. Yes, he will be working in new areas in 10 years, as guided into interdisciplinary projects by his industrial contacts.

Lacksonen found Lipset's research performance to be "acceptable" and stated that "his reputation and potential" in the research category are "outstanding."

{¶ 27} Dr. Ruven Brooks also wrote a recommendation letter. His letter is more vague than Lacksonen's, but "predict[ed] that [Dr. Lipset] will have a successful, diverse, long term research career."

{¶ 28} Dr. Philip Wolfe, an Arizona State University professor, stated that he had concern regarding Lipset's scholarly contributions because (1) he had only two publications in refereed journals, (2) his research funding level had not been

significant, and (3) his research seemed focused on "old" manufacturing problems, meaning issues that have been studied for some time. Wolfe did not find Lipset's accomplishments "poor," but saw "some avenues for him to significantly improve the results of his efforts."

6

## Comparisons to Other Faculty Awarded Promotion and Tenure

{¶ 29} The commission presented evidence regarding Koonce's and Dr. Richard Gerth's promotion and tenure to show that they also had deficiencies in at least one of the three categories, yet were granted tenure.

a

### Dr. Gerth

{¶ 30} Dr. Helmut Zwahlen, the chair of Gerth's promotion and tenure committee, wrote the following regarding Gerth's promotion and tenure: "The committee has serious concerns about Dr. Gerth's history of teaching effectiveness." The committee ranked his teaching effectiveness "at the most 'average to below average.'" The committee ranked his scholarly activities as "average" to "below average." The committee explained that its rating was "primarily based upon the low number of actual publications (only four from 1992 to 1997) in archival journals, combined with questions about his ability to independently attract research sponsorship." The committee ranked his sponsored research activity as "above average" to "average." The committee felt that Gerth's "archival publications record" presented "a real promotion problem." The committee ranked Gerth's service record as "above average." Although the committee unanimously voted not to recommend Gerth for promotion to Associate Professor, the committee unanimously voted to recommend Gerth for tenure. Zwahlen explained: "In spite of the committee's concerns regarding teaching effectiveness, considering that Dr. Gerth is providing the IMSE department with valuable expertise in the areas of quality systems, quality control, experimental design methodology, tolerancing, and that the IMSE Department, the ENT College and the University has invested a considerable amount of resources in Dr. Gerth, the committee recommends tenure for Dr. Gerth. With appropriate improvements in the teaching area, the archival referred publications, and a higher research funding success rate, the committee feels that Dr. Gerth has the potential to become a highly successful faculty member in the IMSE Department in the future."

### b

### Dr. Koonce

{¶ 31} Gerth, the chair of Koonce's promotion and tenure committee, explained the committee's findings in a January 8, 1999 letter to Parks. Gerth stated that Koonce's "overall teaching effectiveness is 'below average' to 'average.'" Gerth explained that "[t]he committee was divided on his scholarly activities rating him a 'below average' to 'above average.'" He stated that the committee did not agree on the significance of "several issues including: (1) Publications: With one exception, Dr. Koonce's archival journal publications are all in a single journal; (2) Proposals: fewer than 2 external proposals per year submitted almost exclusively to NSF, and no proposals pending since April of 1998; (3) Collaboration: nearly all publications and research is collaborative." Gerth wrote, "A negative interpretation is that Dr. Koonce is incapable of establishing his own research focus independent of his major collaborators, and that his research is only published in one journal of low quality. Although a majority of the committee members did not ascribe to this interpretation, all committee members expressed some concern over one or more of the above issues." Gerth stated that the committee nonetheless believed that "Dr. Koonce will continue to attract external funding, publish in archival journals, and establish himself as a preeminent scholar." The committee also rated Koonce's service as "below average" to "average."

{¶ 32} The committee subsequently voted to award Koonce promotion and tenure. In closing, Gerth noted that "this was a difficult case" and made the following observations: (1) "There were significant discrepancies as to the criteria for promotion and tenure. It was clear that different committee members had differen[t] expectations. I think the tenure and promotion expectations of each senior faculty should be made clear in an annual letter to the junior faculty, if only to inform the junior faculty what they can expect"; and (2) "[T]here was unanimous agreement that the annual evaluation letters from the department chair were ineffective in helping the candidate improve his career prospects. They were virtually identical from year to year with little concrete suggestions for improvement."

### B

### ADMINISTRATIVE LAW JUDGE FINDINGS

{¶ 33} After hearing the evidence in the case sub judice, the committee's Administrative Law Judge ("ALJ") recommended that the commission dismiss the complaint because the evidence did not show that Ohio University unlawfully discriminated against Lipset due to his age. The ALJ found that even if the

commission proved a prima facie case of age discrimination, (1) Ohio University presented a legitimate, nondiscriminatory reason for Lipset's promotion and tenure denial and (2) the commission failed to prove that Ohio University's reason was merely a pretext for age discrimination. The ALJ noted that although the commission introduced evidence of a few ageist remarks that Lipset's peers and superiors made, those remarks constituted "stray remarks" because the commission presented no evidence that (1) the remarks occurred during the time frame of Lipset's promotion and tenure process or that (2) the remarks were in any way related to the decisional process. The ALJ found: "All of the comments introduced by the Commission were either an isolated use of an age-related comment, a stray remark, or remote in time and unrelated to the decisional process." The ALJ further found that the commission had failed to show that the promotion and tenure committee's rating of Lipset's research and tenure record was false or inaccurate. Thus, the ALJ recommended that the commission dismiss the complaint.

## C

### THE COMMISSION'S DECISION

{¶ 34} The commission declined to accept the ALJ's recommendation. Instead, the commission determined that Ohio University denied Lipset promotion and tenure due to his age. The commission found "that the ALJ did not take notice of reliable, probative and substantial evidence in the record which establishes that unlawful discrimination occurred."

{¶ 35} In particular, the commission found that the ALJ had failed to account for several facts. Although Lipset was deficient in research, the year before his tenure application, he was awarded the IMSE department Research Award. Before that, he was awarded the Engineering College's "Outstanding Research Paper Award." Lipset published numerous research papers in some of the most highly respected journals in engineering and presented papers at numerous conferences. Lipset also received grants as a result of his research proposals.

{¶ 36} Parks, in his yearly evaluation during the same year that Lipset applied for tenure, informed Lipset that his "areas of special strength are clearly scholarship, teaching and service to the College and Department." Just before his promotion and tenure denial, Lipset was recommended for the largest merit raise in his department. The amount of increase was based upon merit in "teaching, research, and service." The commission found that "[t]hese three areas * * * are the exact same criteria" used in evaluating a professor for promotion and tenure. "In other words, just prior to his denial of tenure and

promotion, Dr. Lipset's performance was rated higher than every other professor in his department, including professors who had already been tenured."

{¶ 37} The commission additionally found that the ALJ failed to account for the fact that substantially younger professors were treated better. "[S]ubstantially younger professors in the IMSE Department have been awarded promotion and tenure despite having markedly lower performance ratings than Dr. Lipset in the categories of teaching, service, and research. For example, Dr. Richard Gerth was recommended for tenure at the age of 38. Overall, Dr. Gerth's teaching was rated to be 'at the most' below average to average. Likewise, Dr. Parks' annual evaluations of Dr. Gerth repeatedly cited his poor teaching skills. Dr. Gerth's scholarly research was also ranked as 'below average' to 'average' due to his low number of actual publications, and his annual evaluation letters repeatedly pointed out his 'serious deficiency' in publications." He nevertheless was granted tenure in January of 1998.

{¶ 38} The commission also found that Koonce had received tenure at the age of 32, even though he "had severe performance deficiencies." The commission found that Koonce "was rated as 'below average' to 'average' with regard to his teaching. Dr. Koonce's research efforts were noted to have been 'only published in one journal of low quality,' with several other negative comments. Dr. Koonce was also rated 'below average' to 'average' in the service category. Dr. Koonce was rated, to some degree, as 'below average' in each category of 'teaching, service, and research,' and yet he was recommended for tenure on January 8, 1999."

{¶ 39} The commission also found that "[s]everal persons involved in the ultimate decision to deny tenure and promotion to Dr. Lipset demonstrated a troubling animus against older persons. In fact, Dr. Gerth, who was involved in the decision to deny tenure and promotion to Dr. Lipset, documented his feelings regarding Dr. Lipset's age when he wrote that Dr. Lipset was 'too old' for the job. Although this comment was written by Dr. Gerth during the hiring process, the fact that the comment referenced Dr. Lipset's overall qualifications to be a professor, combined with the fact that the comment was made in writing, is reliable, probative, and substantial evidence demonstrating that Dr. Gerth denied Dr. Lipset tenure due to his age." The commission further stated: "Dr. Gerth also made it known to Dr. Lipset that he felt Dr. Lipset's years of industrial experience before he came to Ohio University would taint his ability to succeed as a professor. Dr. Gerth stated that Dr. Lipset had spent 'way too many years' working on industrial problems to succeed."

{¶ 40} The commission further found that Koonce also made "comments exhibiting a bias against age. Dr. Koonce referred to Dr. Lipset and other older (and already retired) faculty members as 'legacies,' a term that was used to refer

to 'old and outdated' computer equipment. Dr. Koonce further told Dr. Lipset that several female Masters candidates picked Dr. Lipset as their advisor because they felt safe with him due to the fact that he is 'old enough to be their father.'"

{¶ 41} The commission also found that Parks had "documented his preference for younger workers. Dr. Parks sent several letters, including letters to Dr. Lipset, praising other professors in the department as an 'exciting group of young faculty' and stating that, with the addition of two new professors 'we are so fortunate to have two bright and young faculty to start the fall quarter.'"

{¶ 42} The commission concluded that the foregoing events constituted reliable, probative, and substantial evidence that Ohio University denied Lipset promotion and tenure due to his age. The commission determined that Ohio University had articulated a nondiscriminatory reason (i.e., Lipset's inadequate research), but the commission discredited the reason and found it pretextual.

{¶ 43} The commission cited evidence to support its conclusion that Ohio University's articulated reason was pretextual. First, Lipset received the highest merit raise within his department just prior to the denial of tenure and promotion. The commission stated: "Using the exact same 'teaching, service, and research' criteria that was allegedly utilized for the tenure and promotion decision, Dr. Lipset received the highest score in his department. Dr. Lipset's 'teaching, service, and research' score was even higher than those [of] substantially younger professors who had recently been granted promotion and tenure—Dr. Koonce and Dr. Gerth. The Commission finds this to be reliable, probative, and substantial evidence indicating that the reason given for the subsequent denial of promotion and tenure to Dr. Lipset was not based upon inadequate performance or, specifically, inadequate research."

{¶ 44} Second, the commission further referred to Lipset's awards as evidence to support its pretext finding. The commission stated: "In the year just prior to his tenure application, Dr. Lipset was awarded the IMSE Department Research Award. Dr. Lipset was also awarded the Engineering College's 'Outstanding Research Paper Award.'"

{¶ 45} Third, the commission also determined that Ohio University's articulated reason was pretextual because Lipset published "numerous research papers in highly respected journals in engineering, and presented at numerous conferences, and also received grants as a result of his research proposals." The commission noted that Ohio University's claim that it denied Lipset promotion and tenure due to inadequate research was not credible because other, younger professors, who exhibited weaker records, were granted tenure. The commission explained: "[O]ther professors in Dr. Lipset's department were awarded promotion and tenure despite having markedly lower performance records in the categories of teaching, service, and research. Dr. Richard Gerth was recommended for tenure

despite having ratings of 'at the most' below average to average, and having annual evaluations that repeatedly cited his poor teaching skills. Likewise, Dr. David Koonce was recommended for tenure despite being rated, to some degree, as 'below average' in each category. The Commission finds this to be reliable, probative, and substantial evidence indicating that the reason given for the denial of promotion and tenure to Dr. Lipset was not applied to other, substantially younger professors, and was pretextual."

{¶ 46} The commission concluded that "the real reason for the denial of promotion and tenure [was] Dr. Lipset's age. To begin with, Dr. Koonce (age 32) and Dr. Gerth (age 38) are substantially younger than Dr. Lipset (age 51). The ratings which resulted in promotion and tenure for Dr. Koonce and Dr. Gerth are inferior to Dr. Lipset's rating, and yet they were granted tenure and promotion while he was denied."

{¶ 47} The commission also cited the various age-related comments as evidence of discrimination:

Chairman Parks, as well as Dr. Gerth and Dr. Koonce, all demonstrated a disturbing history of praising youthful faculty, while being critical of older faculty. Most disturbing of all is Dr. Gerth's assessment that Dr. Lipset was, in his own words, "too old" to be a successful professor. While this comment was made at the time of Dr. Lipset's hire, it was written, and lends credence to Dr. Lipset's other allegations of age-related comments. Further, the written comment provides remarkable insight into Dr. Gerth's view that age was a barricade to Dr. Lipset's career goal of becoming a professor.

This evidence, along with Dr. Gerth's further comments that Dr. Lipset's years of industrial experience would taint his ability to succeed as a professor, and that Dr. Lipset had spent "way too many years" working on industrial problems to succeed, coupled with Dr. Koonce's comments comparing Dr. Lipset to "old and outdated" computer equipment, and Chairman Parks repeated written preferences for "young faculty" in the IMSE Department, are all examples of reliable, probative, and substantial evidence that age was the reason for Dr. Lipset's denial of tenure and promotion.

## D

## TRIAL COURT PROCEEDINGS

{¶ 48} On February 6, 2006, Ohio University appealed the commission's decision to the Athens County Common Pleas Court. The trial court reversed the commission's decision and determined that reliable, substantial, and probative evidence did not support the commission's finding that Ohio University's reason for denying Lipset promotion and tenure was false and a pretext for discrimina-

tion. The trial court concluded that the evidence the commission cited to support its finding of pretext is not reliable, probative, and substantial evidence of age discrimination.

{¶ 49} In particular, the trial court found no evidence to support the commission's statement that Lipset's teaching and research awards mirrored the promotion and tenure criteria. The trial court emphasized that the evidence revealed a reasonable, professional disagreement concerning Lipset's research record. Further, the trial court found no reliable, substantial, and probative evidence to support the commission's finding of intentional age discrimination. The trial court noted that none of the age-related comments related to the decisional process that resulted in Lipset's denial of promotion and tenure. The trial court explained: "Lipset was hired after the remark of 'too old' was written in the hiring interview form by Gerth. Parks' June 1, 1999, letter in which he refers to young faculty members interested in computers also complimented Lipset's expertise. The Court finds that Koonce's statement and Park's [sic] April 24, 1998, e-mail do not suggest malice or ill will towards Lipset. Gerth's statement may be accurate in the academic world. Koonce and Gerth did not make their statements while they were members of Lipset's promotions and tenure committee." [3]

{¶ 50} The trial court also noted that Lipset first complained of age discrimination one and one-half years after the promotion and tenure process began. Lipset testified that he did not file a grievance based on age discrimination during his six years of employment.

{¶ 51} The commission and Lipset now appeal the trial court's decision.

## II

{¶ 52} Appellants' first three assignments of error challenge the propriety of the trial court's decision to reverse the commission's decision. Therefore, we consider them together.

{¶ 53} In their first assignment of error, appellants assert that the trial court independently and improperly reviewed the record, rather than determining whether some reliable, probative, and substantial evidence exists to support the commission's finding. Appellants claim that the trial court looked to other, contrary evidence in the record that the commission did not rely upon to reach its decision. Appellants appear to assert that a trial court, in reviewing a commission decision, is limited to reviewing only the evidence that the commission relied

---

3. Assuming that the trial court's reference to Parks's letter is the "thank-you letter," the trial court's characterization of the letter as "complimenting" Lipset may not be entirely accurate. Rather, the letter merely mentions Lipset and his 15 years of manufacturing experience.

upon to reach its finding of discrimination. Thus, appellants contend that the trial court was bound to affirm the commission's order if some reliable, probative, and substantial evidence supports it.

{¶ 54} In their second assignment of error, appellants argue that the trial court improperly weighed the evidence. Appellants assert that the trial court did not simply find a lack of evidence to support the commission's decision, but instead looked at the entire record to determine whether the evidence supported appellee's version of events. Within their first and second assignments of error, appellants additionally argue that the trial court abused its discretion by concluding that reliable, probative, and substantial evidence did not support the commission's finding of discrimination.

{¶ 55} In their third assignment of error, appellants contend that the trial court failed to consider the ageist remarks as reliable, probative, and substantial evidence of age discrimination.

### III

### TRIAL COURT STANDARD OF REVIEW

{¶ 56} We first address appellants' first and second assignments of error regarding the trial court's standard of review.

{¶ 57} Under R.C. 4112.06(E), "a trial court must affirm a finding of discrimination under R.C. Chapter 4112, if the finding is supported by reliable, probative and substantial evidence on the entire record." *Ohio Civ. Rights Comm. v. Case W. Res. Univ.* (1996), 76 Ohio St.3d 168, 177, 666 N.E.2d 1376; see also *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 20 O.O.3d 200, 421 N.E.2d 128. "Reliable, probative, and substantial evidence" means that quantum of evidence that would support a finding of discrimination under Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S.Code. *Plumbers,* 66 Ohio St.2d at 196, 20 O.O.3d 200, 421 N.E.2d 128. " 'Reliable' evidence is dependable or trustworthy; 'probative' evidence tends to prove the issue in question and is relevant to the issue presented; and 'substantial' evidence carries some weight or value." *Case W. Res. Univ.,* 76 Ohio St.3d at 178, 666 N.E.2d 1376, citing *Our Place, Inc. v. Ohio Liquor Control Comm.* (1992), 63 Ohio St.3d 570, 571, 589 N.E.2d 1303.

{¶ 58} Under this standard, a trial court must necessarily engage in a limited weighing of the evidence. As *Plumbers* explained: "[W]hen a court of common pleas reviews an administrative order, it serves a hybrid function. The court must determine as a matter of law whether the administrative decision is

supported by reliable, probative, and substantial evidence. To make this determination, however, the court must necessarily consider the evidence. Specifically, 'where it appears that the administrative determination rests upon inferences improperly drawn from the evidence adduced, the court may reverse the administrative order.'" (Citation omitted.) Id. at 200, 20 O.O.3d 200, 421 N.E.2d 128, quoting *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 111–112, 17 O.O.3d 65, 407 N.E.2d 1265; see also *Voiers Ent., Inc. v. Ohio Civ. Rights Comm.*, 156 Ohio App.3d 195, 2004-Ohio-738, 805 N.E.2d 138, at ¶ 12 (a trial court may reverse the commission's finding if it rests upon inferences improperly drawn from the evidence); *Vinton Cty. School Dist. Bd. of Edn. v. Ohio Civ. Rights Comm.* (July 14, 1982), Vinton App. No. 388, 1982 WL 3476 (a trial court may consider "the probative character of the evidence and the weight to be given it, when deciding if the agency's order is supported by reliable, probative and substantial evidence").

{¶ 59} Thus, when a trial court reviews the commission's finding, it must "appraise all the evidence * * * 'and, if from such a consideration it finds that the * * * [board's] order is not supported by reliable, probative, and substantial evidence and is not in accordance with law, the court is authorized to reverse, vacate, or modify the order * *. *.'" *Conrad*, 63 Ohio St.2d at 110, 17 O.O.3d 65, 407 N.E.2d 1265. "[W]hether an agency order is supported by reliable, probative and substantial evidence essentially is a question of the absence or presence of the requisite quantum of evidence. Although this in essence is a legal question, inevitably it involves a consideration of the evidence, and to a limited extent would permit a substitution of judgment by the reviewing Common Pleas Court." Id. at 111, 17 O.O.3d 65, 407 N.E.2d 1265. Furthermore, while "a Court of Common Pleas 'must give due deference to the administrative resolution of evidentiary conflicts,' [*Conrad*, 63 Ohio St.2d at 111, 17 O.O.3d 65, 407 N.E.2d 1265], [d]ue deference * * * does not contemplate uncritical acquiescence to administrative findings." *Plumbers*, 66 Ohio St.2d at 200, 20 O.O.3d 200, 421 N.E.2d 128.

{¶ 60} Thus, "[a]s can be seen from the court's rulings in *Conrad* and *Plumbers*, the common pleas court is permitted to inquire and examine the weight and credibility of the evidence upon which the commission based its decision, and that if after its inquiry, the common pleas court determines that the commission's order is not supported by reliable, probative and substantial evidence, it may reverse the commission's order." *Vinton Cty. School Dist.*

{¶ 61} Based upon our review of the foregoing authority, we disagree with appellants' assertion that a trial court may not look to all of the evidence in the record and engage in a limited weighing of the evidence. Rather, we believe

that the foregoing case authority establishes that a trial court may appropriately determine, after its review of the evidence in the record, whether the commission drew improper inferences from that evidence.[4] Consequently, we disagree with appellants' argument that the trial court applied an incorrect standard of review when it reviewed the commission's finding of discrimination.

## IV

## RELIABLE, PROBATIVE, AND SUBSTANTIAL EVIDENCE

{¶ 62} We next consider appellants' argument that the trial court's conclusion that reliable, probative, and substantial evidence does not support the commission's finding of discrimination constitutes an abuse of the trial court's discretion.

## A

## APPELLATE STANDARD OF REVIEW

{¶ 63} In contrast to a trial court's standard of review of a commission decision, an appellate court's scope of review is more limited. *Case W. Res. Univ.*, 76 Ohio St.3d at 177, 666 N.E.2d 1376. "The role of the appellate court in

---

**4.** {¶ a} Despite the holdings of *Case W.*, *Conrad*, and *Plumbers*, appellants argue that the trial court was required to uphold the commission's findings as long as "some reliable, probative, and substantial evidence" supported it. See *T. Marzetti v. Doyle* (1987), 37 Ohio App.3d 25, 523 N.E.2d 347, which states: "If the findings of the commission are supported by some reliable, probative, and substantial evidence (albeit disputed evidence), the courts are not free to set them aside even though the courts could have drawn different inferences." We note, however, that at least three Ohio Supreme Court decisions set forth the standard of review and do not include the word "some" before "reliable, probative, and substantial evidence." See *Monahan v. Liquor Control Comm.* (Mar. 6, 1990), Franklin App. No. 89AP–591, 1990 WL 20081 (rejecting the appellant's argument that the trial court must affirm the commission's finding if supported by "some" evidence in an R.C. 119.12 appeal). Furthermore, both *Conrad* and *Plumbers* explain that a trial court may, to a limited extent, weigh the evidence. Therefore, we disagree with the very restrictive standard of review that appellants advocate. Instead, we apply the standard as explained above, as applied in our previous decisions, and as applied in prior Ohio Supreme Court cases, none of which has been overruled.

{¶ b} Appellants appear to rely upon *Ohio State Univ. v. Ohio Civ. Rights Comm.* (1991), 57 Ohio St.3d 615, 567 N.E.2d 260, to support its standard-of-review argument. Appellants claim that *Ohio State Univ.* held: "On the evidence in the record, the commission could, and did, reasonably conclude that OSU discriminated against Dr. Zaharlick because of her handicap. The evidence could also support other, competing inferences, some of which my colleague Justice Wright identifies in his dissent. As a reviewing court, however, we would be bound to uphold the commission's finding and order because it is 'supported by reliable, probative, and substantial evidence.' " Id. at 616, 567 N.E.2d 260 (Brown, J., concurring). Contrary to appellants' argument, the Ohio Supreme Court did not reach any holding in this case. Instead, the court dismissed the appeal as improvidently allowed. Justice Brown wrote the quote to which appellants refer in a concurring opinion that agreed with the decision to dismiss the appeal. Thus, we find nothing persuasive about appellants' reliance on this case.

reviewing commission orders is * * * to determine whether the trial court abused its discretion in finding that there was reliable, probative and substantial evidence to support the commission's order. See *Cleveland Civ. Serv. Comm. v. Ohio Civ. Rights Comm.* (1991), 57 Ohio St.3d 62, 65, 565 N.E.2d 579, 582. A trial court abuses its discretion where its decision is clearly erroneous, that is, the trial court misapplies the law to undisputed facts." *Case W. Res. Univ.*, 76 Ohio St.3d at 177, 666 N.E.2d 1376, citing *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 10 O.O.3d 332, 383 N.E.2d 564.

## B

### AGE-DISCRIMINATION CLAIM

{¶ 64} R.C. 4112.02 prohibits unlawful discriminatory practices:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

{¶ 65} The ultimate inquiry in an age-discrimination case is whether an employee was discharged on account of age. *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 505, 575 N.E.2d 439. " 'Whether or not the employer has good cause to terminate an employee is not an issue in an employment discrimination case. Even if the employee is discharged unnecessarily or in error, the employer is not guilty of [age] discrimination, unless plaintiff proves that he was treated differently on account of his [age] from other employees with the same work history * * *.' " *Plumbers*, 66 Ohio St.2d at 199, 20 O.O.3d 200, 421 N.E.2d 128, quoting *Williams v. Yazoo Valley–Minter City Oil Mill* (D.C.N.D.Miss.1978), 469 F.Supp. 37, 49.

{¶ 66} As the court explained in *Ohio Civ. Rights Comm. v. Kent State Univ.* (1998), 129 Ohio App.3d 231, 244, 717 N.E.2d 745, fn. 8: "Every employment decision necessarily involves some type of 'discrimination' in the word's ordinary sense: 'The ability or power to discern.' Webster's II New Riverside University Dictionary (1988) 385. There will always be a differentiating factor that permits an employer to choose between applicants whether it be where a particular applicant went to school, whom the applicant knows, or what the applicant is wearing. It is only discrimination on certain invidious grounds such as race, religion, national origin, etc. that violates R.C. 4112.02(A) and Title VII." Thus, "[w]hen a plaintiff alleges disparate treatment, 'liability depends on whether [age] actually motivated the employer's decision.' That is, the plaintiff's age

must have 'actually played a role in [the employer's decision making] process and had a determinative influence on the outcome.'" *Reeves v. Sanderson Plumbing Prods., Inc.* (2000), 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105, quoting *Hazen Paper Co. v. Biggins* (1993), 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338.

{¶ 67} Courts have recognized that "'the question facing triers of fact in discrimination cases is both sensitive and difficult,'" and "'[t]here will seldom be "eyewitness" testimony as to the employer's mental processes.'" *Reeves,* 530 U.S. at 141, 120 S.Ct. 2097, 147 L.Ed.2d 105, quoting *United States Postal Serv. Bd. of Governors v. Aikens* (1983), 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403. Thus, when analyzing age-discrimination claims that rely primarily upon circumstantial evidence, Ohio courts employ the framework articulated in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. See *Williams v. Akron,* 107 Ohio St.3d 203, 837 N.E.2d 1169, at ¶ 9; *Barker v. Scovill* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807; *Walter v. ADT Security Sys.,* Franklin App. No. 06AP–115, 2007-Ohio-3324, 2007 WL 1874247, at ¶ 14; see also *Reeves,* 530 U.S. at 141, 120 S.Ct. 2097, 147 L.Ed.2d 105. Under the *McDonnell Douglas* analysis, in the absence of direct evidence of age discrimination, proving an age discrimination claim involves three, evidentiary-shifting steps. See *McDonnell Douglas*; *Barker*; *Walter,* at ¶ 14. First, a plaintiff must present a prima facie case of age discrimination. *Williams,* supra, at ¶ 10. If the plaintiff sets forth a prima facie case, a presumption of discrimination arises. Id. at ¶ 11, citing *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207. Second, if the plaintiff sets forth a prima facie case of age discrimination, the employer may overcome the presumption by producing evidence that it possessed a legitimate, nondiscriminatory reason for the discharge. See *Williams* at ¶ 12; *Kohmescher,* supra. "If the employer submits admissible evidence that 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has met its burden of production. *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407. At this point, the presumption created by the prima facie case drops from the case because the employer's evidence has rebutted the presumption of discrimination." *Williams* at ¶ 12. Third, the employee may refute the employer's reason for discharge by proving that the employer's proffered reason was a mere pretext for unlawful discrimination. Id. at ¶ 14. To show pretext, the employee must prove that the employer's reason was false and that discrimination was the real reason for the discharge. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207.

## 1

## PRIMA FACIE CASE

{¶ 68} To establish a prima facie case of age discrimination, "a plaintiff-employee must demonstrate that he or she (1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age." *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781, paragraph one of the syllabus. In the case at bar, the parties appear to agree that the commission set forth a prima facie case of age discrimination.[5] We therefore do not address this element.

## 2

## EMPLOYER'S LEGITIMATE, NONDISCRIMINATORY REASON

{¶ 69} Once a plaintiff establishes a prima facie case of age discrimination, an employer may refute the presumption of discrimination by producing evidence to show that it possessed a legitimate, nondiscriminatory reason for the adverse employment action. See *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207. Because the employer's "burden is one of production, not persuasion," it "can involve no credibility assessment." *St. Mary's Honor Ctr.*, 509 U.S. at 509, 113 S.Ct. 2742, 125 L.Ed.2d 407. Once the employer meets its burden of production, "the sole remaining issue [is] 'discrimination vel non.'" *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105, quoting *United States Postal Serv. Bd. of Governors v. Aikens* (1983), 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403.

{¶ 70} In the case at bar, appellee cited Lipset's deficient scholarly activities, specifically his lack of sponsored projects and independent research, to justify its decision to deny him promotion and tenure. The promotion and tenure committee exhaustively explained why Lipset's research failed to meet the department's expectations for promotion and tenure. Koonce testified that the committee found Lipset's research deficiency to be a serious weakness that his excellent teaching and service record could not overcome. "It is beyond peradventure that deficient scholarship is a legitimate nondiscriminatory reason for denying a faculty member tenure." *Langland v. Vanderbilt Univ.* (D.C.Tenn. 1984), 589 F.Supp. 995, 1003.

---

5. Interestingly, the evidence revealed that Ohio University hired a 47-year-old replacement for Lipset. Additionally, the IMSE department apparently tenured two faculty members over the age of 40 since the Lipset decision.

{¶ 71} Because the commission met its burden to establish a prima facie case, and because appellee satisfied its burden to produce evidence that articulated a legitimate, nondiscriminatory reason for the challenged action, the ultimate issue in this matter is whether the trial court abused its discretion by determining that the commission's finding that appellee's proffered reason is a pretext for intentional discrimination is not supported by reliable, probative, and substantial evidence.

## 3
## PRETEXT

{¶ 72} Once an employer meets its burden of production, "the plaintiff must then have an opportunity to prove, by a preponderance of the evidence, that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207, citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817, 36 L.Ed.2d 668. To establish that a reason was a pretext for discrimination, the discharged employee must show " 'both that the reason was false, and that discrimination was the real reason.' " *Williams,* 107 Ohio St.3d 203, 837 N.E.2d 1169, at ¶ 14, quoting *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742, 125 L.Ed.2d 407. Thus, "[t]he employee may not satisfy his burden in this final stage by merely showing the employer's reasons are unworthy of credence. Nor is the fact that the court may disagree with the employer's judgment of the employee determinative. He must also show that the employer's real reason for the employment decision was unlawful discrimination (i.e., discrimination on the basis of national origin, gender, race, etc.)." (Citations omitted.) *Kent State Univ.,* 129 Ohio App.3d at 246, 717 N.E.2d 745.

{¶ 73} Consequently, "the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff. [*St. Mary's Honor Ctr.,*] 509 U.S. at 511 [113 S.Ct. 2742, 125 L.Ed.2d 407]. The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason * * * is correct.' Id. at 524 [113 S.Ct. 2742, 125 L.Ed.2d 407]. In other words, '[i]t is not enough * * * to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.' " *Reeves,* 530 U.S. at 146–147, 120 S.Ct. 2097, 147 L.Ed.2d 105, quoting *St. Mary's Honor Ctr.,* 509 U.S. at 519, 113 S.Ct. 2742, 125 L.Ed.2d 407.

{¶ 74} *Reeves* further explained:

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may,

together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." [*St. Mary's Honor Ctr.*, 509 U.S.] at 511, [113 S.Ct. 2742, 125 L.Ed.2d 407].

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See id., at 517 [113 S.Ct. 2742, 125 L.Ed.2d 407] ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West*, 505 U.S. 277, 296 [112 S.Ct. 2482, 120 L.Ed.2d 225] (1992); see also *Wilson v. United States*, 162 U.S. 613, 620–621 [16 S.Ct. 895, 40 L.Ed. 1090] (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev.1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 [98 S.Ct. 2943, 57 L.Ed.2d 957] (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. See *Aka v. Washington Hosp. Ctr.*, 156 F.3d [1284], at 1291–1292; see also *Fisher v. Vassar College*, 114 F.3d [1332], 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimi-

nation will be weak or nonexistent"). To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not "treat discrimination differently from other ultimate questions of fact." *St. Mary's Honor Ctr.*, supra, at 524 [113 S.Ct. 2742, 125 L.Ed.2d 407] (quoting *Aikens*, 460 U.S., at 716 [103 S.Ct. 1478, 75 L.Ed.2d 403] ).

*Reeves*, 530 U.S. at 147–148, 120 S.Ct. 2097, 147 L.Ed.2d 105.

{¶ 75} In the case at bar, the commission determined that appellee's proffered reason of inadequate research to deny Lipset promotion and tenure is unworthy of belief and that discrimination is the real reason for its action. We examine each of its findings in turn.

a

### Falsity of Proffered Reason

{¶ 76} The commission found that appellee's reason is not worthy of belief because (1) appellee previously granted tenure to two younger professors (Koonce and Gerth) who had shortcomings in at least one of the three categories; (2) Lipset received the highest merit raise in his department, which is based upon the "exact same 'teaching, service, and research' criteria" used to evaluate his promotion and tenure; (3) Lipset received the IMSE Department Research Award and the Engineering College's Outstanding Research Paper Award; and (4) Lipset "published numerous research papers in highly respected journals in engineering, and presented at numerous conferences, and also received grants as a result of his research proposals."

(1)

### COMPARISON AMONG LIPSET, KOONCE, AND GERTH

{¶ 77} To determine whether comparing Lipset's record to Koonce's and Gerth's records constitutes reliable, probative, and substantial evidence of pretext, we must review Koonce's and Gerth's alleged shortcomings to see whether they are substantially similar to Lipset's shortcomings that led the committee to deny him tenure and promotion.

(a)

### Lipset

{¶ 78} Lipset was 51 years of age when the committee denied him promotion and tenure. The committee (composed of Koonce, Welch, and Sampson) explained that it denied him promotion and tenure due to "significant reservations about [his] commitment to funded research and [his] progress towards an

identifiable personal research track." The committee noted that Lipset, at the time of his promotion and tenure application, had "no current research proposals or funding" and that "[h]istorically, [his] proposals were sent to a very limited number of funding agencies." The committee cited Lipset's lack of individual research, noting that all his publications "were co-authored with Dr. Van Til, your Ph.D. advisor, or Dr. Judd." The committee also noted that "with one exception, [his] latter papers were all co-authored with graduate students under the direction of Dr. Judd, as opposed to graduate students under [Dr. Lipset's] direction." The committee found this to be "a major weakness." The committee also determined that Lipset "had too few articles published in professional journals." The committee did not dispute that Lipset's teaching and service record were excellent.

(b)

Gerth

{¶ 79} Gerth was 38 when he applied for promotion and tenure.

{¶ 80} Zwahlen, the chair of Gerth's promotion and tenure committee, wrote that the committee had "serious concerns about Dr. Gerth's history of teaching effectiveness." The committee ranked his teaching effectiveness "at the most 'average to below average.'" The committee ranked his scholarly activities as "average" to "below average." The committee explained that its rating was "primarily based upon the low number of actual publications (only four from 1992 to 1997) in archival journals, combined with questions about his ability to independently attract research sponsorship." The committee ranked his sponsored research activity as "above average" to "average." The committee felt that Gerth's "archival publications record" presented "a real promotion problem." The committee ranked Gerth's service record as "above average." The committee unanimously voted not to recommend Gerth for promotion to Associate Professor, but unanimously voted to recommend Gerth for tenure. Zwahlen explained: "In spite of the committee's concerns regarding teaching effectiveness, considering that Dr. Gerth is providing the IMSE department with valuable expertise in the areas of quality systems, quality control, experimental design methodology, tolerancing, and that the IMSE Department, the ENT College and the University has invested a considerable amount of resources in Dr. Gerth, the committee recommends tenure for Dr. Gerth. With appropriate improvements in the teaching area, the archival referred publications, and a higher research funding success rate, the committee feels that Dr. Gerth has the potential to become a highly successful faculty member in the IMSE Department in the future."

(c)

Koonce

{¶ 81} Koonce was 32 when he applied for promotion and tenure. Gerth, the chair of Koonce's promotion and tenure committee, explained the committee's findings in a January 8, 1999 letter to Parks. Gerth stated that Koonce's "overall teaching effectiveness is 'below average' to 'average.'" Gerth explained, "The committee was divided on his scholarly activities rating him a 'below average' to 'above average.'" He stated that the committee did not agree on the significance of "several issues including: (1) Publications: With one exception, Dr. Koonce's archival journal publications are all in a single journal; (2) Proposals: fewer than 2 external proposals per year submitted almost exclusively to NSF, and no proposals pending since April of 1998; (3) Collaboration: nearly all publications and research is collaborative." Gerth wrote, "A negative interpretation is that Dr. Koonce is incapable of establishing his own research focus independent of his major collaborators, and that his research is only published in one journal of low quality. Although a majority of the committee members did not ascribe to this interpretation, all committee members expressed some concern over one or more of the above issues." Gerth stated that the committee nonetheless believed that "Dr. Koonce will continue to attract external funding, publish in archival journals, and establish himself as a preeminent scholar." The committee rated Koonce's service as "below average" to "average." The committee voted two-to-three to award Koonce promotion and tenure. In closing, Gerth noted that "this was a difficult case."

(d)

Analysis

{¶ 82} The commission concluded that both Gerth and Koonce, like Lipset, had received some unfavorable ratings, yet nonetheless received tenure. However, we do not believe that the trial court abused its discretion by determining that the commission improperly inferred age discrimination from this fact. When each professor was evaluated for promotion and tenure, the promotion and tenure committee consisted of three different sets of individuals. The committee that considered Gerth's case was not the committee that considered Koonce's case, and neither committee considered Lipset's case. As the trial court noted, reasonable, professional minds disagreed over Lipset's qualifications for tenure, just as they apparently did in reviewing Koonce's qualifications. Again, Koonce's promotion and tenure committee did not unanimously recommend him for promotion and tenure.

{¶ 83} Thus, even if the respective promotion and tenure committees treated Lipset, Koonce, and Gerth differently, the committees did not do so on account of age, but, rather, on account of the precise nature of the professors' differing strengths and qualifications. Apparently, the committees placed great emphasis on the ability to succeed as a researcher and pursue external funding sources, and less emphasis on teaching effectiveness and service. Gerth and Koonce appear to have had better performances in these area than Lipset. Moreover, the promotion and tenure guidelines provide that the "relative weighting of [the three areas] in determining promotion and/or tenure is not necessarily the same for every faculty member or every department. The candidate's balance of development and total contribution to the Department and College is what is considered in the final decision." Koonce's and Gerth's tenure committees found that they had strong potential to become leaders in their respective fields, despite weak teaching or research performance. In contrast, Lipset's tenure committee unanimously interpreted his dossier as indicating that his sponsored research activity was slowing and that he lacked an independent research focus. Furthermore, Koonce testified that his promotion and tenure application presented a stronger case than Lipset's because Lipset's papers mostly were published with other faculty and not with his own graduate students, whereas Koonce's papers were published with his own graduate students. Koonce also testified that his funded research record was stronger and that at the time of his promotion and tenure application, he had "six individual research initiatives that [he] was applying to or working with external contacts on." Koonce noted that at the time Lipset applied for promotion and tenure, he had no current proposals. Welch testified that he observed a "big difference" between Koonce's and Gerth's research projects and proposals and Lipset's projects and proposals. Welch stated that Koonce wrote several proposals and four were funded. Gerth had a sustained level of proposals and five were funded. Lipset, however, had one proposal funded.

{¶ 84} Moreover, the lowest ratings that the respective promotion and tenure committees gave Koonce and Gerth were "below average to average." Lipset's promotion and tenure committee did not specify whether his research rating was "below average" or "average," as the committee did not use any specific rating. Instead, the committee stated that it had "significant reservations" about his "commitment to funded research and [his] progress towards an identifiable personal research track." The committee found this to be a "major weakness." There is no evidence in the record, however, that a "below average to average" rating is similar to "major weakness." The commission apparently speculated that the committee would have ranked Lipset as "below average to average" in the research category, but speculation does not constitute reliable, probative, and

substantial evidence. Thus, we believe that the commission drew improper inferences based upon evidence that is not in the record.

{¶ 85} Furthermore, Parks's 1999 evaluation stated that while Lipset's publication record was acceptable, he lacked "an entrepreneurial vision for developing sponsored programs." Moreover, in the year before his promotion and tenure application, Parks warned Lipset that his lack of sponsored research activity "might pose a serious problem" for his promotion and tenure. Parks stated that he felt Lipset was not "aggressive enough in seeking and obtaining sponsored research." Even Lipset apparently recognized that he needed more sponsored research activity. Lipset told Koonce about a project that Judd proposed that he work on, but Lipset declined and stated that his decision would "probably cost [him] tenure."

{¶ 86} When comparing the particulars of Gerth's and Koonce's promotion and tenure applications, rather than simply examining, as the commission did, the general overview of the candidates' strengths and qualifications, we agree with the trial court that reasonable minds could, and obviously did, disagree about Lipset's qualifications for promotion and tenure. Thus, we cannot conclude that the trial court abused its discretion by concluding that reliable, probative, and substantial evidence fails to support the commission's finding that appellee's proffered reason to deny tenure was false in light of the comparison of Gerth's, Koonce's, and Lipset's promotion and tenure committee decisions.

### (2)

### Lipset's Merit Raise

{¶ 87} The commission also cited Lipset's merit raise as evidence of pretext. The commission apparently concluded that the basis for Lipset's merit raise was the same as the basis for granting tenure. The commission determined that because Lipset was awarded the highest merit raise, he must have had the highest rating within his department for teaching, research, and service—even among tenured faculty. The commission thus inferred that if this is true, a denial of promotion and tenure based upon inadequate research could only be a pretext for discrimination.

{¶ 88} After our review of the record, however, we find no evidence to demonstrate that the Annual Salary Raise Committee used the same standards to evaluate merit raises as the promotion and tenure committee used to evaluate Lipset's teaching, research, and service. In fact, our review of the record belies such a conclusion. In proposing the raises, the committee stated: (1) "The annual raise would be based on merit in teaching, research, and service for each faculty"; (2) *The committee considered only major components* (due to limited time frame) *of activities in those areas*: number of courses taught, course

evaluations, research projects amount, number of submitted proposals, journal papers, and committees * * *." (Emphasis added.) In calculating the merit raises, "the committee ranked all faculty members for each of three areas, and computed averages from those as proposed raise levels."

{¶ 89} We cannot know how the committed ranked Lipset in the three areas. We only know that when the applicable criteria were averaged, those three areas resulted in Lipset's having the highest score. It is possible that Lipset had the highest teaching and service scores, but the lowest research score, yet still had a high average score. Additionally, unlike the commission, we do not agree that the highest average score meriting an annual salary increase correlates to automatic entitlement to promotion and tenure and that any other result demonstrates age discrimination. As the promotion and tenure guidelines make clear, a promotion and tenure candidate must satisfy many components within each of the three areas before promotion and tenure will be granted. The Annual Merit Raise Committee did not rely upon each of those same components within the three areas of teaching, research, and service. Instead, as it explicitly noted, the committee relied upon a short list of components within the three categories. In other words, the commission compared separate, dissimilar, and unrelated standards to draw an improper inference in order to arrive at its conclusion.

{¶ 90} Thus, we do not believe that the trial court's conclusion that reliable, probative, and substantial evidence fails to support the commission's finding that Lipset's merit raise proves that the promotion and tenure committee's reference to his inadequate research was false constitutes an abuse of discretion.

(3)

Lipset's Awards

{¶ 91} The commission additionally found that appellee's proffered reason of inadequate research was false because Lipset's awards demonstrated that his research was adequate.

{¶ 92} Similar to Lipset's merit raise issue, as we discussed infra, we also find no evidence in the record to demonstrate that the two awards Lipset received were based upon the same criteria that qualify a faculty member for promotion and tenure. The most that can be gleaned from the record is that (1) in 1998, Lipset received the "Outstanding Undergraduate Research Paper Award" and (2) in 1999, Lipset received the IMSE department outstanding undergraduate research award. We find nothing in the record to show that the criteria for either award is similar to the promotion and tenure criteria. Thus, we do not believe that the trial court's conclusion that reliable, probative, and substantial evidence fails to support the commission's finding that Lipset's

research awards proved the falsity of appellee's proffered reason constitutes an abuse of discretion.

(4)

## Lipset's Research

{¶ 93} The commission next cited the research outlined in Lipset's dossier as support for its finding of falsity. While we cannot dispute the commission's recitation of that evidence, we note that the commission appears to have independently evaluated Lipset's dossier and reached its own decision regarding the quality of his publications and his qualification for promotion and tenure. The commission, however, is not an Ohio University promotion and tenure committee. Lipset's dossier speaks for itself, and the promotion and tenure committee obviously found that his research component did not meet the department's expectations. To allow the commission's finding on this issue to stand would, in effect, allow the commission to sit as a tenure committee and decide the fates of individuals who seek university promotion and tenure. We, however, are keenly aware that "courts are to tread lightly when reviewing faculty employment decisions, especially in the area of academia." *Kent State Univ.*, 129 Ohio App.3d at 252, 717 N.E.2d 745. Moreover, even if Lipset's publication record is strong, the committee found his research component lacking due to his failure to have consistent and current sponsored research activity. At the time of his promotion and tenure application, Lipset had no current proposals. Moreover, on average Lipset had proposed only one project per year of employment, and only one proposal was ultimately funded.

{¶ 94} Consequently, we do not believe that the trial court's conclusion that reliable, probative, and substantial evidence fails to support the commission's finding that appellee's proffered reason is unworthy of belief and, thus, demonstrated pretext, constitutes an abuse of discretion. To the contrary, appellee cited legitimate, nondiscriminatory reasons to deny Lipset promotion and tenure. Thus, reliable, probative, and substantial evidence does not support the commission's finding that appellee's reason to deny promotion and tenure are unworthy of belief. As noted above, we believe that the commission drew improper inferences based upon its selective review of selective portions of the evidence. Therefore, because the commission failed to present reliable, probative, and substantial evidence that appellee's proffered reason to deny promotion and tenure was false, it is unable to establish pretext.

{¶ 95} Accordingly, we agree with the trial court that in the case sub judice, appellants did not establish an age-discrimination claim. See *Williams*, supra (to prove pretext, the plaintiff must show both that the proffered reason is false and that the real reason for the adverse employment action was discrimination).

Much of appellants' remaining argument is therefore moot. Nonetheless, we will address the additional evidence that the commission cited as circumstantial evidence of discrimination.

b

### Evidence That Appellee's Real Reason for Denying Lipset Promotion and Tenure Was Discrimination

{¶ 96} In addition to concluding that appellee's proffered reason was false, the commission found evidence to demonstrate, in its view, that the actual reason to deny Lipset promotion and tenure was his age. The commission referred to the following evidence: (1) Koonce and Gerth, who are both younger than Lipset, received tenure, but had ratings "inferior" to Lipset and, thus, the tenure guidelines were not applied equally to all persons regardless of age and (2) the age-related remarks made by Parks, Gerth, and Koonce "demonstrated a disturbing history of praising youthful faculty, while being critical of older faculty" and was circumstantial evidence of age discrimination.

(1)

### Comparison to Koonce and Gerth

{¶ 97} Earlier in this opinion, we discounted the commission's reliance on its misguided comparison of Lipset, Koonce, and Gerth, and we do not repeat it here. For those same reasons, we do not believe that the trial court's determination that the commission's reliance upon this comparison is not reliable, probative, and substantial evidence that discrimination is the real reason for appellee's denial of promotion and tenure constitutes an abuse of discretion.

(2)

### "Stray Remarks"

{¶ 98} The commission also relied upon various age-related remarks that Parks, Koonce, and Gerth made during Lipset's employ as a faculty member. Although the ALJ and the trial court classified those comments as "stray remarks," the commission concluded that the remarks constitute circumstantial evidence of age discrimination. The trial court's discounting of the comments as "stray remarks" forms the basis for appellants' third assignment of error.

{¶ 99} In order for age-related remarks to constitute circumstantial evidence of age discrimination, a nexus must exist between the remarks and the adverse employment action. *Byrnes v. LCI Communication Holdings* (1996), 77 Ohio St.3d 125, 130, 672 N.E.2d 145 ("There must be a link or nexus between the discriminatory statement or conduct and the prohibited act of discrimination to

establish a violation of [Chapter 4112].");  see also *Geier v. Medtronic, Inc.* (C.A.7, 1996), 99 F.3d 238, 242 ("To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process").  "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee." *Byrnes,* 77 Ohio St.3d at 130, 672 N.E.2d 145.  Courts have classified such comments as "stray remarks," which are insufficient to prove discrimination.  See, e.g., *Wohler v. Toledo Stamping & Mfg. Co.* (C.A.6, 1997), 125 F.3d 856.  Thus, statements unrelated to the decisional process or " 'statements by nondecisionmakers * * * [can not] suffice to satisfy the plaintiff's burden * * *' of demonstrating animus." *Bush v. Dictaphone Corp.* (C.A.6, 1998), 161 F.3d 363, 369 (quoting *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (O'Connor, J., concurring));  see also *Rowan v. Lockheed Martin Energy Sys., Inc.* (C.A.6, 2004), 360 F.3d 544, 550 ("statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden in demonstrating animus"); *Merrick v. Farmers Ins. Group* (C.A.9, 1990), 892 F.2d 1434, 1438 (a remark unrelated to the decisional process is insufficient to show discrimination based on age); *Smith v. Firestone Tire & Rubber Co.* (C.A.7, 1989), 875 F.2d 1325, 1330 (a stray remark made in the workplace unrelated to the decisional process is insufficient to show discrimination based on race).  Furthermore, age-related comments that do not occur near the time of the adverse employment action are "stray remarks" that are insufficient to show discrimination.  See *Phelps v. Yale Sec.* (C.A.6, 1993), 986 F.2d 1020, 1026 (comment made one year before discharge is too far removed in time to be indicative of discriminatory intent in the adverse action decision);  see also *Smith v. Leggett Wire Co.* (C.A.6, 2000), 220 F.3d 752, 759–760 (comments "not relevant" when they were made "long before" the employee's termination); *Russell v. Acme–Evans Co.* (C.A.7, 1995), 51 F.3d 64, 68 (a derogatory comment about an employee's race made 15 years prior to the termination decision is "too tenuously related to the alleged discriminatory action by supervisors many years later" to create an inference of discrimination); *Boyle v. Mannesmann Demag Corp.* (C.A.6, 1993), 991 F.2d 794 (statement by person who took part in termination decision four years prior to the decision was a stray remark, thus not indicative of illegal employment discrimination).

{¶ 100} In the case at bar, we do not believe that the trial court's conclusion that the various age-related comments fail to constitute reliable, probative, and substantial evidence that discrimination is the actual reason to deny Lipset promotion and tenure constitutes an abuse of discretion.  We again note that none of the comments occurred at the time of Lipset's 2000 promotion and tenure

application. Rather, the comments occurred in 1997, 1998, and 1999. Additionally, none of the comments related to the decisional process. Koonce's reference to some faculty members as "legacies" had nothing to do with Lipset's promotion and tenure decision. The comment regarding female graduate students choosing Lipset as their advisor likewise had nothing to do with Lipset's promotion and tenure decision. Parks's e-mail and other references to "young" faculty also had no relation to Lipset's promotion and tenure process. Therefore, none of the aforementioned comments constitute reliable, probative, and substantial circumstantial evidence that discrimination was the real reason to deny Lipset promotion and tenure.

{¶ 101} Accordingly, based upon the foregoing reasons, we hereby overrule appellants' first, second, and third assignments of error.

V

{¶ 102} In their fourth assignment of error, appellants assert that the trial court abused its discretion by imposing an additional requirement that a victim must recognize and complain of the age discrimination to prove an age-discrimination claim. We disagree with appellants.

{¶ 103} In the case sub judice, we do not believe that the trial court imposed a requirement that Lipset must have actually complained of age discrimination during his association with Ohio University. Rather, we believe that the trial court simply commented upon Lipset's failure to complain of age discrimination as additional circumstantial evidence that appellee did not discriminate against him. Moreover, even if we accept the view that the trial court improperly relied upon this evidence, we believe that any such error constitutes harmless error. As we outlined in our discussion of appellants' first, second, and third assignments of error, even without considering this evidence, the trial court's conclusion that reliable, probative, and substantial evidence fails to support the commission's finding of discrimination does not constitute an abuse of discretion.

{¶ 104} Accordingly, based upon the foregoing reasons, we hereby overrule appellants' fourth assignment of error.

VI

{¶ 105} In their fifth assignment of error, appellants assert that the trial court abused its discretion by attributing particular arguments to the commission that it did not present, and then faulting the commission for failing to offer evidence to support those arguments. Appellants contend that they did not make the following arguments: (1) that the research awards were based upon the same

criteria; and (2) that Lipset's high ratings in the teaching and service categories should "compensate" for his alleged deficiency in the research category.

{¶ 106} Even assuming for purposes of argument that the trial court improperly attributed such arguments to the commission, we find any such error to constitute harmless error. Even in the absence of these arguments, the trial court did not abuse its discretion by concluding that reliable, probative, and substantial evidence fails to support the commission's finding of discrimination.

{¶ 107} Accordingly, based upon the foregoing reasons, we hereby overrule appellants' fifth assignment of error.

## VII

## CONCLUSION

{¶ 108} In summary, we first emphasize that the sole issue in this matter is whether Ohio University denied Lipset promotion and tenure on account of his age. No other factor should be considered in this inquiry. In our view, the trial court, after it engaged in a thorough review of the record and a limited weighing of the evidence, properly concluded that Lipset's age was not a factor in the promotion and tenure decision. Thus, we agree with the trial court that the commission's administrative determination is not supported by reliable, probative, and substantial evidence.

{¶ 109} We further agree with the trial court's conclusion that the evidence the commission cites to support its determination is actually based upon inferences improperly drawn from that evidence and, thus, is unreasonable. For example, the commission's (1) attempt to make identical comparisons of various attributes of different candidates for promotion and tenure, when the committees that evaluated the different candidates varied in their composition, is unreasonable, (2) decision to impose its views and beliefs concerning the relative value of various qualities that the commission apparently thinks a promotion and tenure committee should prefer is unreasonable, and (3) conclusion that stray workplace remarks support the view that Lipset was denied tenure due to his age, when, however, the remarks had no causal connection to the promotion and tenure decision, is unreasonable. The fact remains, as the trial court aptly notes, that reasonable, professional minds disagreed over Lipset's qualifications for promotion and tenure.

{¶ 110} We also emphasize that we fully recognize and appreciate the fact that Lipset, by all accounts, possessed an excellent teaching, scholarship, and service record during his association with Ohio University. It is apparent, however, that the promotion and tenure committee placed great emphasis on Lipset's inability to obtain external research funding, and less emphasis on Lipset's ability to

teach. In this regard, the record is replete with references to Lipset's inability, or lack of desire, to obtain external funding for research projects (e.g., references in the record include the discussion of Lipset's failure to aggressively seek and obtain "sponsored research" or "funded research"; that Lipset authored inadequate and too few "research proposals and projects"; that Lipset "lacked entrepreneurial vision for developing sponsored programs"; and that various references used throughout the promotion and tenure process include the terms (1) "grant proposals," (2) "funded proposals," (3) "external contracts," (4) "lack of external funding," (5) "lack of sponsored research," (6) "lack of independent research," (7) "limited number of proposals sent to funding agencies," and (8) "research funding success rate").

{¶ 111} Although many may argue that the promotion and tenure committee's focus was misguided and that Ohio University should have been primarily concerned about a candidate's teaching ability, neither this appellate court, nor the common pleas court or the commission is vested with the authority to make this policy determination. Admittedly, we, if sitting as Lipset's promotion and tenure committee, may not have valued educational considerations over financial and research considerations. It is unfortunate that the ability to teach students may not be as highly valued as the ability to procure research funds. On the other hand, we recognize the vast array of important benefits and discoveries that have flowed from vigorous institutional research.

{¶ 112} Again, however, we emphasize that we sit as a court with the duty to resolve legal disputes. We do not sit as a promotion and tenure committee with the duty to resolve promotion and tenure issues. A court's role (and the commission's role) in this arena must be limited to a determination whether discrimination occurred during the promotion and tenure process, not whether a candidate, in the court's view, may deserve tenure. Courts and commissions are ill-suited to evaluate various academic criteria used for promotion and tenure decisions, and courts should not generally invade the faculty employment decision process. Rather, educational and academic professionals are charged with that important duty, and their guidepost should be the best interests of the students and the institution.

{¶ 113} Therefore, although the members of this court admire Lipset's record and his demonstrated ability as an effective educator, we agree with the trial court's conclusion that Ohio University did not deny Lipset promotion and tenure due to his age, but, rather, due to other considerations.[6]

---

6. {¶ a} The members of this court acknowledge and appreciate the fact that a university may value certain factors and considerations over other factors when making promotion and tenure decisions. In the case sub judice, it appears that the applicant's ability to procure

{¶ 114} Accordingly, in the case sub judice, we believe that the trial court properly concluded that (1) the evidence in the record does not contain reliable, probative, and substantive evidence to support the commission's determination that Ohio University denied Lipset promotion and tenure due to his age and (2) Ohio University demonstrated legitimate, nondiscriminatory and nonpretextual reasons to deny Lipset promotion and tenure, and Lipset's age did not motivate that decision. Thus, because the trial court did not abuse its discretion in this matter, we must uphold its decision.

{¶ 115} Therefore, based upon the foregoing reasons, we hereby overrule appellants' assignments of error and affirm the trial court's judgment.

Judgment affirmed.

HARSHA and MCFARLAND, JJ., concur.

HARSHA, Judge, concurring.

{¶ 116} I concur with the principal opinion but also believe Professor Lipset failed to present a prima facie case of age discrimination. The only evidence in the record concerning the age of Lipset's replacement came from Professor Park, who stated that the new hire was 47 years old. Because Lipset was 51 when he was denied tenure, he cannot satisfy the element of "replacement by a substantially younger person."

---

external funding or revenue was a very important factor, if not the most important factor. We note that a January 1, 2008 letter to the *Columbus Dispatch* from Dr. Albert A. Gabel may both shed some light on this topic and show that other institutions have also grappled with this issue. That letter provides:

{¶ b} This is in response to a brief on the Insight front of Nov. 25, "Fewer professors have tenure." It stated, "The shift results from financial pressures, administrators' desire for more flexibility in hiring, firing and changing courses and the growth of community colleges and regional public universities focused on teaching basics and preparing students for jobs."

{¶ c} The shift also is occurring in universities nationwide, including Ohio State University. It makes the universities become more purely research institutions, with good teachers having little influence in guiding the departments and colleges. One of the major ways the administrators and boards of trustees balance the budgets is by deducting 40 percent from "traditional" research grants for overhead.

{¶ d} Those who get big grants, irrespective of the quality of their research, get promoted, get raises and bonuses, and control the institutions. New hires are not allowed to go on tenure track unless they show outstanding ability to procure research grants. Others must become contract professors.

{¶ e} A few decades ago, the unwritten rule was "publish or perish"; now, it is "get grants or perish." The former was easy, because some of the most valuable publications are produced from shoestring funding or small "nontraditional" grants which will not permit overhead to be charged. Professors get little credit for good teaching. Because real teachers no longer have much control, the quality of teaching decreases.

{¶ 117} And while it seems unfair that being the best teacher really doesn't carry the day, I would hope reviewing courts will apply the same level of scrutiny that is evident here to cases involving other forms of discrimination.