[Cite as *Pagano v. Case W. Res. Univ.*, 2021-Ohio-59.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

MARIA PAGANO, :

    Plaintiff-Appellant, :

                     No. 108936

    v. :

CASE WESTERN RESERVE
UNIVERSITY, :

    Defendant-Appellee. :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** January 14, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-890527

---

### *Appearances:*

Margolius, Margolius and Associates, Andrew L. Margolius, and Markus S. Lyytinen, *for appellant*.

Taft, Stettinius and Hollister, L.L.P., David H. Wallace, and William A. Doyle, *for appellee*.

---

MARY EILEEN KILBANE, J.:

## I. INTRODUCTION

{¶ 1} Plaintiff-appellant, Dr. Maria Pagano ("Dr. Pagano"), appeals the trial court's grant of summary judgment in favor of former employer defendant-appellee

Case Western Reserve University ("CWRU"). The lawsuit arises from CWRU's denial of Dr. Pagano's application for tenure and promotion within the CWRU School of Medicine ("SOM"). On December 18, 2017, Dr. Pagano sued CWRU for breach of contract, promissory estoppel, breach of implied contract, and breach of the implied covenant of good faith and fair dealing. At the close of discovery, CWRU moved for summary judgment.

{¶ 2} The trial court ruled in favor of CWRU on July 31, 2019. The court issued an opinion with its judgment entry. In granting summary judgment, the court noted that "Ohio Courts have been reluctant to intrude on tenure decisions" and that "'[a] court should intervene [in tenure decisions] only where an administration has acted fraudulently, in bad faith, abused its discretion, or where the candidate's constitutional rights have been infringed.'" (R. 33, quoting *Hall v. Ohio State Univ. College of Humanities*, 2011-Ohio-6842, 2011 Ohio Misc. LEXIS 599 (Ohio Court of Claims) ([quoting] *Gogate v. Ohio State Univ.*, 42 Ohio App.3d 220, 225-26, 537 N.E.2d 690 (10th Dist.1987); and *Bassett v. Cleveland State Univ.*, Ohio Court of Claims No. 1982-02100 (1982)).)

{¶ 3} The court characterized Dr. Pagano's complaint as an attempt to "'circumvent well established case law regarding tenure decisions by asserting that the contract was breached because CWRU failed to develop 'clear and comprehensive' criteria for each tenure track.'" R. 33. The court found Dr. Pagano's attempt "unavailing" and concluded that "nothing in the evidence presented shows

that CWRU acted fraudulently, in bad faith, abused its discretion, or infringed on Plaintiff's constitutional rights." R. 33.

{¶ 4} Dr. Pagano appeals, raising one assignment of error:

> The trial court erred in granting the appellee's motion for summary judgment because disputed material issues of fact exist regarding the appellee's contractual obligations toward the appellant.

{¶ 5} Courts usually do not interfere in tenure decisions, and we do not question CWRU's assessment of Dr. Pagano's qualifications. Rather, Dr. Pagano has alleged specific contractual violations that occurred during CWRU's tenure review process and provided evidence that the procedural violations prejudiced her. For the reasons that follow, we find that genuine issues of material fact exist regarding Dr. Pagano's breach of contract claim and therefore reverse the trial court's judgment and remand for further proceedings.

## II. STANDARD OF REVIEW

{¶ 6} Our standard of review for summary judgment appeals is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

> [W]e use the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The party moving for summary judgment bears the initial burden of apprising the trial court of the basis of its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on an essential element of the nonmoving party's claim. *Dresher v. Burt,* 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). Once the moving party meets its burden, the burden shifts to the nonmoving party to set forth specific facts demonstrating a genuine issue of material fact exists. *Id.* To satisfy this burden, the nonmoving party must submit evidentiary materials showing a genuine dispute over material facts. *PNC Bank, N.A. v. Bhandari*, 6th Dist. Lucas No. L-12-1335, 2013-Ohio-2477, ¶ 9.

*Lillie & Holderman v. Dimora*, 8th Dist. Cuyahoga No. 100989, 2015-Ohio-301, ¶ 9.

{¶ 7} The following elements must be established to grant summary judgment:

> The motion for summary judgment may only be granted when the following are established: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in its favor. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978); Civ.R. 56(C).

*Id.*

{¶ 8} We, as the reviewing court, evaluate the record in a light most favorable to Dr. Pagano, the nonmoving party. *Saunders v. McFaul*, 71 Ohio App.3d 46, 50, 593 N.E.2d 24 (8th Dist.1990). Any "doubts must be resolved in favor of the nonmoving party." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138 (1992).

## III. BACKGROUND

### A. The Parties

{¶ 9} Dr. Pagano's extensive curriculum vitae includes a Ph.D. in human development and social policy from Northwestern University, master's degrees in psychology and biostatistics from Harvard University and CWRU, respectively, and bachelor's degrees in child development and art history from Tufts University. Before working at CWRU, she was an assistant professor at Brown University, Director of the Information Science Unit in Brown University's Department of

Psychiatry, and a training faculty member of Brown University's Center for Alcohol and Addiction Studies from 2001-2005. CWRU recruited and hired Dr. Pagano in 2005 as an assistant tenure-track professor in CWRU's School of Medicine's ("SOM'S") department of psychiatry ("Department"). In 2010, CWRU promoted Dr. Pagano to associate professor.

{¶ 10} CWRU is a renowned nonprofit institute of higher education located in Cleveland, Ohio. The university is comprised of multiple undergraduate, graduate, and six professional schools.

**B. Governing Documents**

{¶ 11} The parties agree that promotion and tenure at CWRU are governed by the CWRU Faculty Handbook ("Handbook"), the SOM Bylaws ("Bylaws"), and the documents appended to each, including the "2015-2016: CWRU School of Medicine Promotion and Tenure Guidelines, Process, and Procedures for Nominating Full-Time Faculty for Promotion to Associate Professor or Professor and/or Award of Tenure," revised February 23, 2015 ("Guidelines").

**C. Tenure Tracks**

{¶ 12} A tenure appointment affords the recipient the right to retain a position until retirement. (Bylaws, Article 5.4.) The Bylaws require tenure consideration to occur "no later than in the ninth year after the date of initial appointment at the rank of assistant professor or higher." (Bylaws, Article 5.5.) If tenure is not awarded, "further appointment is normally restricted to one year." (Bylaws, Article 5.5.)

{¶ 13} Research-focused tenure candidates, like Dr. Pagano, must identify themselves as either an independent scientist, a team scientist, or as a hybrid of both when they apply for tenure.  (Guidelines, Section III.)  Thus, the SOM offers three tracks for tenure:  the traditional track of independent scientific research, and the more recent options of team scientist and hybrid scientist.  Dr. Pagano transferred from the independent research track to the hybrid track and states that the transfer was at the SOM's suggestion.

{¶ 14} While the governing documents describe "independent" and "team" scientists, there is no such detailed description of "hybrid" scientists, other than as some type of combination of independent and team.  The Guidelines provide:

> A typical independent scientist is one who has been awarded or aspires to be awarded federal, foundation, or other extramural funding as Principal Investigator with the greater portion of their research program, publications, and national reputation resting on work derived from research projects for which they have been the major driver.  A typical example would be a principal investigator with extramural support awarded through a competitive peer-reviewed process from a federal (e.g., NIH R01, P[rincipal] I[nvestigator] on a major component of a program project, VA Merit award) or foundation source who publishes results as first or senior author along with graduate students and other junior scientists.

> Typical team scientists are those for whom the greater portion of their research accomplishments, publications, and national reputation rest on original, creative, indispensable, and unique contributions made either a) in conjunction with a group of other scientists, or b) with a changing series of groups of other scientists.  A team scientist may play the same or different roles within each team.  A successful team scientist will be able to document national recognition for the research area, approach, technique or theme that characterizes his or her work through such means as study section memberships, invited presentations, editorial positions on boards of peer review journals, national awards for such work, etc.

A significant portion of a candidate's contributions may be made both as an independent and a team scientist, in which case the candidate should identify himself or herself as of both types.

(Guidelines, Section III.)

**D. Tenure and Promotion Criteria**

{¶ 15} The Handbook requires CWRU to set forth specific obligations and accomplishments necessary to obtain promotion and tenure. (Handbook, Chapter 3, Part One, Article I, Section F(3)-(4).) Generally, "[t]enure is awarded to a faculty member only when the university foresees for him or her continuing fulfillment of the qualifications" of:

a) an expert knowledge of his or her academic field and a commitment to continuing development of this competence; (b) a dedication to effective teaching; (c) a commitment to a continuing program of research or other advanced creative activity or, where more appropriate to the particular academic context, professional service activities; and (d) a willingness to assume a fair share of university administrative and service tasks.

(Bylaws, Appendix I, Article I, Section A.) (*See also* Handbook, Chapter 3, Part One, Article One, Section F(7) ("Tenure is awarded to a faculty member only when the University foresees for him or her a continuing fulfillment of the qualifications presented above.").)

{¶ 16} Similarly, "promotions should reflect the candidate's documented fulfillment of these qualifications and the growth of his or her corresponding contributions." *Id.* The Bylaws also note that "the creative and professional service accomplishments of the faculty may take many different forms" and provide that "the evaluation of a candidate's activities [for promotion] should be based on his or

her academic competence, teaching effectiveness, and contributions to attainment of the particular academic objectives of his or her department or school and the university as a whole." *Id.*

{¶ 17} Within the SOM, the award of tenure and promotion is based on the following factors: (1) excellence in scholarly research; (2) a high level of teaching effectiveness; and (3) accomplishments in professional service. *Id.* at Sections B and C. With regard to the research component, the Bylaws acknowledge the "increasing emphasis on interdisciplinary research team science" as opposed to individual achievements and provides that "factors as originality, creativity, indispensability, and unique abilities may be considered when" evaluating team scientist candidates. *Id.* "The award of tenure will recognize both independent investigators and those whose contributions to research team science are judged to be comparably meritorious." *Id.* at Section C.

{¶ 18} The Bylaws further provide the following criteria for promotion to full professor and the award of tenure:

> Professor. The candidate's prior achievements in teaching, research and professional service shall be evaluated. For appointment or promotion to the rank of professor in the tenure track, the candidate must present evidence of sustained excellence, enhanced recognition for research contributions, and a national or international reputation. Candidates must demonstrate an established reputation as individual investigators or within a research team, for original ideas, innovations, and contributions. A high level of teaching effectiveness and service contributions is also required.

> Award of Tenure. The candidate's prior achievements in research teaching, and professional service shall be evaluated. Tenure may be awarded to productive independent investigators who have engaged in

substantial research activity that is recognized nationally or internationally, as evidenced by a substantial list of first or senior-authored, high quality, peer-reviewed publications in high quality, peer-reviewed journals, or to those whose contributions to research team science are judged to be comparably meritorious. Such factors as originality, creativity, indispensability, and unique abilities may be considered when evaluating research team scientists.

*Id.* at Appendix I, Article I, Section C.

{¶ 19} Although the governing documents reference unique requirements for independent and team scientists, there is no equivalent explanation of the requirements hybrid scientists must meet. Dr. Pagano argues that CWRU appears to have recognized this disparity based on a 2016 memorandum.

### E. Lack of Clarity in Criteria for Hybrid Scientists

{¶ 20} A September 22, 2016 CWRU internal memorandum notes that the Bylaws were amended in 2006 to reflect the shift from individual achievements to collaborative interdisciplinary team science research and summarizes team science tenure considerations for SOM's committee on appointments, promotions, and tenure ("CAPT") members to consider in evaluating candidates. The memorandum was written shortly before Dr. Pagano applied for tenure.

{¶ 21} The memorandum also cites the frustration of CAPT members over the difficulties encountered in evaluating different types of candidates:

The [c]ommittee expressed some frustration, however, with the varying degree to which candidate's promotion materials identified them as team scientists (or not). Further, the Committee noted that candidates varied greatly in the comprehensiveness of their supporting materials. In many cases, the Committee felt itself unable to satisfactorily understand and evaluate the role, contributions, and quality of the team science candidate's work.

{¶ 22} A subcommittee was formed to consider the issue and research the protocols at other universities. The result of the review was to maintain the standards and qualifications language for evaluating team scientist candidates, but implement procedural clarifications, including requiring tenure candidates to (1) identify themselves as an independent scientist, a team scientist, or both ("hybrid") and requiring tenure candidates to (2) supplement their promotion materials if the candidate identifies as a team scientist or hybrid. The supplemental materials required are the same for both team and hybrid scientists. These procedural changes are reflected in the Guidelines. In addition to requiring team scientist and hybrid candidates to provide supplemental application materials, the amended procedure also requires CWRU to "notify external referees and communicate the candidate's designation as a team scientist and provide a copy of our promotion standards for evaluation."

## F. Pretenure Reviews

{¶ 23} In accordance with its policies, CWRU conducted performance reviews of Dr. Pagano in the third and sixth years of her tenure-track employment. CWRU also conducted a review in her ninth year of employment after she requested and was awarded an extension of time before she would have been expected to apply for tenure. She pursued an extension due to circumstances beyond her control, including "lacking access to a sufficiently large, clinical population of treatment-seeking alcoholics, 5 office moves in three years, and operational obstacles in forging adolescent addiction research."

**{¶ 24}** The third-year review was completed in 2008. The review recognized Dr. Pagano's successes in funding and research publications, but recommended that she "pursue R01 funding or equivalent federal funding" and "seek renewal of funding prior to the end of the pre-tenure period." CWRU describes an R01 award as a "highly competitive" research grant, awarded by the National Institutes of Health "to support a discrete, specific, circumscribed project by an investigator in an area representing the investigator's specific interests and competencies." (Davis Aff. ¶ 7-8.)

**{¶ 25}** The sixth-year review was completed in 2011. That review noted Dr. Pagano's "innovative" work related to the treatment of addiction in adolescents, among many other professional accomplishments. The review stated the reviewing committee's belief "that the achievement of at least one substantial federal research award (R01) * * * will be necessary to her success" in attaining tenure, but added that given "the severely restricted funding environment, the School of Medicine should consider her key participation as a collaborator on funded research[.]" Dr. Pagano understood the sixth year review to have encouraged her to pursue a team scientist role as opposed to an independent scientist role. (Pagano Aff. ¶ 1.)

**{¶ 26}** Dr. Pagano's final pretenure review was completed in 2014. The final review again noted her impressive productivity "not only in the realms of funded research, but in teaching and mentorship and administrative contributions." The review demonstrated the lack of clarity regarding tenure criteria for independent, team, and hybrid scientists, particularly in the area of funding. CWRU was

"impressed by Dr. Pagano's research and academic productivity, noting in particular her successful achievement of two separate awards * * * total[ing] more than $2 million in direct support for her research[.]"  Despite Dr. Pagano's independent funding sources, CWRU expressed concern "that she has not as of yet achieved an independent R01 or similar federal award" as a principal investigator, but at the same time acknowledged her service as a co-investigator on three R01 grants, and as a senior statistician and statistical consultant on two other R01 grants.

{¶ 27} Dr. Pagano applied for tenure in 2016, at the end of her pretenure period.

### G. Tenure Review Process

{¶ 28} CWRU uses a multilevel review process for promotion and tenure decisions.  The Handbook identifies the constituent faculty's responsibility to promulgate an appropriate review procedure.  (Handbook, Chapter 3, Part One, Article I, Section F(5).)  The review process begins at the department level, then advances to the School of Medicine (SOM), the Dean, the Provost, and the President. At the department level, the department chair and the department's committee on appointments, promotion and tenure ("DCAPT") participate in the review.  At the SOM level, the school's committee on appointments, promotion, and tenure ("CAPT" or "SOM CAPT"), reviews the application.  CWRU summarizes the process as follows:

> 1. The DCAPT submits its recommendations for tenure to the department's chair with the candidate's accompanying application materials for the next level of review. The department's chair reviews these materials, adds his/her recommendation, and forwards the

candidate's application to the SOM's Faculty Affairs Office to ensure there are no errors or omissions.

2. Once it is confirmed that the application is complete, the Faculty Affairs Office solicits letters of reference for the tenure candidate.

3. The tenure candidate's application materials, including the DCAPT's recommendation, the department chair's recommendation and letters of reference, are then transmitted by the Faculty Affairs Office to the SOM's committee on appointments, promotions, and tenure (the "SOM's CAPT") for review and recommendation.

4. After the SOM's CAPT review and recommendation is added to the materials, the candidate's application materials are (i) sent to the dean of the SOM, who reviews the materials and adds her recommendation; and (ii) sent to the Faculty Council Steering Committee, which reviews the SOM's CAPT's recommendations for matters of equity and to ensure adherence to published guidelines and proper procedure.

5. After the dean makes her recommendation, the tenure candidate's application materials are forwarded to CWRU's provost who, with help from an advisory panel to CWRU's president ("President's Advisory Committee" or "PAC"), reviews the materials and makes a recommendation.

6. CWRU's president reviews all of the above materials, reports, and recommendations and renders a final recommendation. Affirmative recommendations are then formally adopted through approval by CWRU's Board of Trustees.

(Appellee brief, p. 9, citing Handbook, Chapter 3, Part One, Article I, Sections I-J; Bylaws, Articles 5.9-5.10.)

{¶ 29} We add that the Bylaws provide that "[a]ll members of a committee shall be supplied with minutes of the meetings of the committee and with copies of official recommendations of the committee." (Bylaws at Article 2.7(d).)

**H. Tenure and Promotion Denial**

{¶ 30} Dr. Pagano applied for tenure consideration in 2016, which was the last year of her pretenure employment during which she could have applied for tenure. The president of CWRU ultimately denied tenure and a promotion, but the various recommendations were inconsistent throughout the review process.

{¶ 31} The department's committee on appointments, promotions, and tenure ("DCAPT") and the department chair unanimously voted to recommend tenure and promotion for Dr. Pagano. The SOM's committee on appointments, promotions, and tenure ("CAPT" or "SOM CAPT") initially voted unanimously in favor of promotion and against tenure. CAPT issued a report summarizing its recommendation.

{¶ 32} In accordance with the Bylaws, Dr. Pagano appealed the decision through the departmental dean of psychiatry. After the internal appeal, the CAPT's unanimous approval in favor of promotion remained intact. However, the previous unanimous vote against tenure flipped to a vote of 6-3 in favor of tenure. CAPT issued an addendum to its initial report to reflect the now-favorable recommendation. However, there are no minutes of the CAPT's meetings and little explanation in the final report as to why six out of nine voting committee members changed their minds and voted to award tenure after Dr. Pagano's appeal.

{¶ 33} The SOM Dean agreed with the CAPT's recommendation to promote Dr. Pagano from associate professor to full professor, but disagreed with the recommendation to award tenure. The Dean cited the lack of independent funding

from a federal source as an area of concern.  She concluded:  "Dr. Pagano lays claim to a hybrid portfolio of individual and team science, but neither area taken by itself reaches the usual expectations for promotion and tenure."

{¶ 34} The Provost recommended against tenure and promotion and cited Dr. Pagano's independent funding as a primary concern.  He determined, for the first time in the process, that a promotion would be meaningless without awarding tenure.

{¶ 35} The President signed off on the Provost's report, finalizing the denial of tenure and promotion.

## IV.  ANALYSIS

{¶ 36} Dr. Pagano argues that summary judgment is improper because there are genuine issues of material fact regarding (1) whether CWRU failed to develop and apply clear and comprehensive criteria for the hybrid tenure track, in violation of the Handbook; (2) whether CWRU failed to evaluate Dr. Pagano according to applicable contractual criteria; (3) whether CWRU failed to follow contractual procedures during the review; and (4) whether those failures substantially prejudiced Dr. Pagano.  We agree.

### A.    The *Gogate* Standard

{¶ 37} CWRU moved for summary judgment on the grounds that Dr. Pagano's professional record did not merit an award of tenure and that courts traditionally do not intervene in subjective academic decisions.  It claims that Dr. Pagano wants "a jury to supplant the role of the academic experts at CWRU charged

with making academic decisions concerning its faculty." It also argues that Dr. Pagano cannot prove she would have been awarded tenure but for any procedural irregularities.

{¶ 38} CWRU largely relies on *Gogate v. Ohio State Univ.*, 42 Ohio App.3d 220, 226, 537 N.E.2d 690 (10th Dist.1987). According to *Gogate*,

> [A] court should intervene [in promotion and tenure considerations] only where an administration has acted fraudulently, in bad faith, abused its discretion, or where the candidate's constitutional rights have been infringed. This court is not a super administrator concerning the assessment of a candidate's particular qualifications for tenure in the university's Department of Architecture.

*Gogate*, citing *Basset v. Cleveland State Univ.*, Court of Claims No. 82-02110 (1982) unreported.

{¶ 39} In other words, "[a]s a general rule, courts must defer to the academic decisions of colleges and universities." *Galiatsatos v. Univ. of Akron*, 10th Dist. Franklin No. 00AP-1307, 2001 Ohio App. LEXIS 4051, 14 (Sept. 13, 2001). We are mindful that courts generally give deference to a university's tenure decisions regarding applicants' qualifications. However, this proposition does not apply if "there has been 'such a substantial departure from the accepted academic norms as to demonstrate that the committee or person responsible did not actually exercise professional judgment.'" *Id.*, quoting *Bleicher v. Univ. of Cincinnati College of Med.*, 78 Ohio App.3d 302, 308, 604 N.E.2d 783 (1oth Dist.1992). Thus, *Gogate* does not preclude claims like Dr. Pagano's where there is evidence that procedural infractions substantially prejudiced the tenure candidate. *Gogate* at 222.

{¶ 40} In Ohio and elsewhere, courts recognize that professors who are denied tenure may have a legal claim if the university that denied tenure failed to comply with the contract terms that govern the tenure review. *See Farnell v. Kenyon College*, 2019 U.S. Dist. LEXIS 33890, *6-8 (S.D. Ohio Mar. 4, 2019) (granting school's motion to dismiss breach of contract claim for denial of tenure where the school operated in accordance with the procedures written in its faculty handbook); *Saha v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1139, 2011-Ohio-3824 (professor's breach of contract claim alleging procedural violations during tenure review proceeded to trial); *Tacka v. Georgetown Univ.*, 193 F.Supp.2d 43, 47-49 (D.D.C.2001) (denying summary judgment to university where factual issues existed as to university's compliance with contractual procedures during its tenure review of plaintiff); *Kakaes v. George Washington Univ.*, 683 A.2d 128, 136 (D.C.1996) (reversing award of summary judgment to defendant university where evidence demonstrated that the university did not substantially comply with contractual requirements set forth in the school's faculty code in rendering notice of its tenure decision); *McDowell v. Napolitano*, 119 N.M. 696, 699-700, 1995-NMSC-029, 895 P.2d 218, 221-222 (upholding jury award to professor for breach of contract arising from defendant university's denial of tenure).

{¶ 41} *See also Fagal v. Marywood Univ.*, M.D.Pa. No. 3:14-cv-02404, 2017 U.S. Dist. LEXIS 167772 (Oct. 11, 2017), quoting *Ferrer v. Trustees of the Univ. of Pa.*, 573 Pa. 310, 340, 825 A.2d 591 (2002) (distinguishing a terminated, tenured professor's breach of contract claim that the university failed to comply with

contractual procedures from a claim that a university has followed procedures, but made the wrong decision); *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C.2006), quoting *Craine v. Trinity College*, 259 Conn. 625, 791 A.2d 518 (2002) ("'The principle of academic freedom does not preclude [the court] from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract.'").

{¶ 42} A comparison to *Hall v. Ohio State Univ. College of Humanities*, Court of Claims No. 2010-10106, 2011-Ohio-6842, *aff'd, Hall v. Ohio State Univ. College of Humanities*, 10th Dist. Franklin No. 11AP-1068, 2012-Ohio-5036, illustrates the difference between a legitimate breach of contract claim, like Dr. Pagano's, and an impermissible request that the court interfere with a school's academic decisions. In *Hall*, the professor's breach of contract claim was dismissed on summary judgment. The underlying nature of the claim, however, differs from Dr. Pagano's breach of contract claim. The professor in Hall argued that the school placed too much weight on one of the contractual requirements for tenure, "excellence in teaching." *Hall* at ¶ 40, 44. In contrast, Dr. Pagano alleges that CWRU improperly considered noncontractual and inapplicable criteria in its review.

{¶ 43} By focusing on the assessment of Dr. Pagano's qualifications, CWRU mischaracterizes the nature of Dr. Pagano's complaint and asks this court to overlook several procedural irregularities that may have impacted its decision to deny tenure and promotion to Dr. Pagano. The dispute before this court today is neither a judicial review of Dr. Pagano's qualifications nor CWRU's academic

discretion. Dr. Pagano does not merely disagree with the outcome of CWRU's review process, as CWRU argues.

{¶ 44} In this instance, Dr. Pagano is not asking the court to substitute its own judgment for that of the CWRU faculty who reviewed her. Rather, she has alleged and provided evidence that CWRU breached the contract by failing to fulfill its obligations and adhere to the tenure review process set forth in the Faculty Handbook, Bylaws, and Guidelines. There is also evidence that the lack of specific criteria for hybrid applicants and irregularities in the review process contributed to CWRU's ultimate denial of Dr. Pagano's application. Such procedural violations can operate as a constraint on CWRU's discretion to deny tenure.

{¶ 45} We have not found any Ohio cases that directly address the precise procedural issues Dr. Pagano has raised. But that by no means disqualifies her breach of contract claim. CWRU's tenure review yielded inconsistent results from start to finish. Dr. Pagano has identified specific contract provisions that may have been breached and provided evidence that reasonably supports that procedural irregularities prejudiced her during the tenure review process. The procedural irregularities alleged in Dr. Pagano's breach of contract claim and the allegations of resulting prejudice are sufficient to overcome summary judgment. *See Saha v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1139, 2011-Ohio-3824, ¶ 22 (professor's breach of contract claim based in part on alleged procedural violations proceeded to trial where the school consistently voted to deny tenure at every level of review and after a re-vote during which one faculty member voted for tenure and 26 voted

against). Accordingly, we find that genuine issues of material fact exist regarding Dr. Pagano's breach of contract claim and that she is entitled to present her case to a jury.

## B. Breach of Contract

{¶ 46} Dr. Pagano's first claim against CWRU is for breach of contract and the implied duty of good faith. It is undisputed that Dr. Pagano had a contract with CWRU, consisting of the Faculty Handbook, Bylaws, and appendices, and that the rules and regulations concerning academic procedures were incorporated into that contract. This is also true as a matter of law. *Salkin v. Case W. Res. Univ.*, 8th Dist. Cuyahoga No. 88041, 2007-Ohio-1139, ¶ 20, citing *Rehor v. Case W. Res. Univ.*, 43 Ohio St.2d 224, 230, 331 N.E.2d 416 (1975). Tenure applicants like Dr. Pagano rely on strict adherence to the tenure review process and fair application of its standards. CWRU recognizes as much; the Handbook provides:

> [I]t is possible to establish guidelines for standards and procedures. It is, furthermore, possible and desirable to establish guidelines to evaluating the success with which members of the faculty fulfill their roles and for the processes by which they are judged by their peers and the administration.

(Handbook, Chapter 3, Part One.)

{¶ 47} It is essential that CWRU follow the procedures set forth in those contractual documents throughout the tenure review process. The failure to do so might negatively impact the review of a tenure candidate. We find genuine issues of material fact exist regarding whether CWRU breached the contract and whether

those potential breaches led to the denial of Dr. Pagano's requests for tenure and promotion.

{¶ 48} "In the context of granting tenure, to prove a breach of contract, Dr. [Pagano] is required to prove both that [CWRU] violated one or more terms of [her] contract and that [s]he was substantially prejudiced as a result." *Saha v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1139, 2011-Ohio-3824, ¶ 26, citing *Gogate v. Ohio State Univ.*, 42 Ohio App.3d 220, 222, 537 N.E.2d 690 (1987). *See also Galiatsatos* at 14. "Substantially prejudiced" means that, but for CWRU's breach, Dr. Pagano would have been awarded tenure. *Id.* at ¶ 27, citing *Logsdon v. Ohio N. Univ.*, 68 Ohio App.3d 190, 195, 587 N.E.2d 942 (3d Dist.1990).

{¶ 49} At this stage in the proceedings, Dr. Pagano must only produce enough evidence to allow a reasonable jury to believe that CWRU breached the contract and that the breach substantially prejudiced Dr. Pagano. We find that she has satisfied that burden and that CWRU is not entitled to summary judgment on her breach of contract claim.

## 1. Failure to Develop and Apply Criteria

{¶ 50} In this section, we first discuss CWRU's potential breach of the contract by failing to develop specific criteria to evaluate hybrid scientists. We next discuss the possibility that CWRU's alleged deficient hybrid criteria caused reviewers to improperly evaluate Dr. Pagano as an independent scientist, even though she applied as a hybrid scientist, with the result being the denial of tenure.

{¶ 51} Dr. Pagano argues that summary judgment is improper because there are genuine issues of material fact regarding whether CWRU breached specific contractual obligations to develop tenure criteria for hybrid scientist candidates. The Handbook provides that "criteria for each category of faculty appointment and for promotion and tenure shall be developed by the constituent faculties" and that the "by-laws of each constituent faculty shall include clear and comprehensive descriptions of * * * the accomplishments necessary for promotions and tenure." (Handbook, Chapter 3, Part One, Article I, Section F(3) and (4).)

{¶ 52} CWRU argues that the Handbook only requires it to develop specific criteria for the different categories of faculty appointments and general tenure criteria. By CWRU's reading, "each category" only modifies "faculty appointment." However, "each category" could be read to modify "faculty appointment," "promotion," and "tenure." "If the contract language is capable of two reasonable but conflicting interpretations * * * there is an issue of fact as to the parties' intent." *Ramey v. Berns Properties, Inc.*, 8th Dist. Cuyahoga No. 79746, 2002-Ohio-663.

{¶ 53} A reasonable jury could reject CWRU's interpretation and determine that CWRU was required to develop criteria for hybrid scientist candidates and breached the contract by failing to do so. The record supports that CWRU never developed specific criteria for hybrid scientist applicants, like Dr. Pagano. The Dean testified that "there are no specific criteria for hybrid applications." (Davis Dep. 49.) In addition, there are several instances throughout the Faculty Handbook and

Bylaws where independent and team scientist criteria are set forth without a separate explanation of the criteria for hybrid scientists.

{¶ 54} Dr. Pagano also argues that the failure to develop specific hybrid criteria substantially prejudiced CWRU's review of her tenure application and caused reviewers to misapply independent scientist criteria and ignore team scientist criteria when evaluating her hybrid application. Essentially, Dr. Pagano argues that she was denied tenure as a hybrid scientist because CWRU improperly required her to satisfy all the requirements for independent scientists and all the requirements for team scientists rather than some combination of each. There is evidence to support that the lack of hybrid criteria prejudiced Dr. Pagano by permitting reviewers to review her primarily as an independent scientist even though she applied as a hybrid scientist.

{¶ 55} CWRU reviewers testified to varying understandings of how to evaluate hybrid scientists. One of the co-chairs testified that the criteria for independent, team, and hybrid scientists is the same, but that "the team scientist and * * * the hybrid can add that component of non-individual research to their research." (Manor Dep. 9.) The Dean stated that a "hybrid candidate is required to present her strongest case for tenure as an individual or independent scientist *and* as a 'team scientist'" and that a "hybrid candidate must show 'excellence' and be 'exceptional' in both categories, as the application is reviewed as a whole." (Davis Aff. ¶ 12-13.) In Dr. Pagano's view, the Dean's assessment contradicts the Handbook

provision that requires CWRU to develop and publish unique criteria for hybrid scientists. A reasonable jury could agree.

{¶ 56} Dr. Pagano also argues that the confusion surrounding the evaluation of hybrid candidates negatively impacted her review in several ways. First, by improperly requiring her to have received federal R01 funding, which is only awarded to independent scientists, as a principal investigator and not just as a co-investigator. Second, by improperly requiring her to have already secured complete funding for after her current funding ended. Third, by favoring independent scientist criteria and ignoring team scientist criteria.

### a. Whether CWRU Misapplied Independent Funding Requirements

{¶ 57} Dr. Pagano argues that CWRU improperly focused on her failure to receive an R01 federal grant throughout the tenure denial process. In her affidavit opposing summary judgment, Dr. Pagano averred that an R01 federal grant is only available to independent, not team or hybrid scientists, though she concedes that it is highly prestigious. Dr. Pagano also complains that the R01 grant is not specifically referenced as a requirement in the Handbook or Bylaws.

{¶ 58} Evidence supports that reviewers focused on the absence of an R01 grant when reviewing Dr. Pagano's application. The committee considered that "Dr. Pagano has been continually funded and has team-based funding lasting until 2019." Three CAPT members determined that the $2 million grant awards Dr. Pagano received placed her on similar footing to many other tenure applications.

However, other members noted that because she had not yet received a federal R01 grant, the likelihood of receiving one in the future was "low."

{¶ 59} The Dean and Provost echoed the concern about R01 federal funding in their reports. Regarding funding, the Dean acknowledged that "the candidate should present convincing evidence that she can continue to support her work, either by individual or by team science grant mechanisms." She went on, however, to focus on the lack of R01 and R01-equivalent grants.

{¶ 60} CWRU's focus on independent funding from a federal source supports Dr. Pagano's claim that she may have received tenure if not for the lack of specified criteria for hybrid scientists. A reasonable jury could find that the lack of specific criteria for hybrid scientist applicants was a breach of contract that caused CWRU to misapply independent funding requirements to Dr. Pagano's application, thus causing substantial prejudice to Dr. Pagano.

{¶ 61} CWRU directs us to *Ohio Univ. v. Ohio Civ. Rights Comm.*, 175 Ohio App.3d 414, 2008-Ohio-1034, 887 N.E.2d 403 (4th Dist.), to argue that considering Dr. Pagano's ability to obtain external funding in the future was within its discretion. That case, however, does not dictate an award of summary judgment here. The professor's claim arising from the denial of tenure in *Ohio Univ.* was primarily based on alleged age discrimination, not a breach of contract, and the court determined whether the school's focus on funding was a pretextual reason for denying tenure. Here, in contrast, there are genuine issues of material fact concerning whether

CWRU breached its contract with Dr. Pagano and substantially prejudiced her by focusing on R01 funding.

{¶ 62} CWRU also argues that the pretenure reviews establish that Dr. Pagano knew CWRU would emphasize independent R01 funding in its tenure review. But the pretenure reviews do not definitively establish that CWRU did not breach the contract in a way that substantially prejudiced Dr. Pagano. That issue remains for a jury to determine. A reasonable jury could find that the pretenure reviews, in addition to the other evidence already discussed, support that CWRU encouraged Dr. Pagano to apply for tenure as a hybrid scientist, yet proceeded to unfairly review her according to inapplicable independent scientist criteria.

### b. Whether CWRU Imposed Future Funding Requirement

{¶ 63} Dr. Pagano also argues that reviewers improperly imposed a requirement of guaranteed future funding that would satisfy her funding requirements after her current funding expired. Her argument is based upon reviewers' use of the term "trajectory."

{¶ 64} Citing the Bylaws, the Dean explained that achievement of tenure requires "an accelerating and not a declining trajectory of accomplishments." Dr. Pagano points out that the term "trajectory" is absent from the governing documents and that CWRU appears to have replaced the contractual term of "continuing fulfillment" with "trajectory" as it relates to ongoing funding obligations. As a result, she argues that reviewers ignored her successful funding history and instead imposed an extracontractual requirement that she have secured funding for when

her current grants expired. She argues this newly imposed requirement substantially prejudiced the review of her tenure application. Based on the review reports and the contract language, a reasonable jury could agree with Dr. Pagano.

### c. Whether CWRU Ignored Team Scientist Criteria

{¶ 65} Dr. Pagano also argues that the reviewers ignored team scientist criteria while simultaneously overemphasizing independent scientist criteria. One of the CAPT co-chairs did not recall whether the committee discussed how to weigh Dr. Pagano's hybrid contributions as an independent scientist and as team scientists. (Clark Dep. 39.) Although some of the review reports mention the team science criteria of originality, creativity, indispensability, and uniqueness in passing, a reasonable jury could find, based on the review reports, that the reviewers did not conduct a meaningful assessment of her team science accomplishments and that Dr. Pagano was denied tenure and promotion as a result of this deviation from the governing contractual procedures.

### 2. Failure to Record and Distribute Minutes

{¶ 66} A jury should also determine whether CWRU breached the contract when the CAPT failed to record and distribute minutes of its voting sessions and whether that potential breach substantially prejudiced Dr. Pagano's application. The Bylaws provide that "[a]ll members of a committee shall be supplied with minutes of the meetings of the committee and with copies of official recommendations of the committee." (Bylaws at Article 2:7(d).)

{¶ 67} Dr. Pagano claims that minutes of the CAPT's meetings were neither recorded nor distributed to committee members. One of the CAPT co-chairs testified that the assistant dean for faculty affairs kept "recordings of the discussion and the decision," but that those "weren't really minutes." (Clark Dep. 9.) The assistant dean for faculty affairs and human resources in the SOM testified that she did not take minutes during the CAPT meetings, although she had her computer open to take some notes. (Deming Dep. 13.) The other CAPT co-chair testified that he did not circulate the report to other committee members. (Manor Dep. 57.) He further testified that he did not know whether the Assistant Dean circulated the report to the other CAPT members. *Id.*

{¶ 68} CWRU claims that the CAPT's final recommendation report satisfies the minutes requirement. However, the Bylaws appear to differentiate between minutes of the meetings and copies of the committee's official recommendations. (Bylaws at Article 2:7(d) ("All members of a committee shall be supplied with minutes of the meetings of the committee and with copies of official recommendations of the committee.").) Even if the final report could serve as minutes, there is little explanation in the report to support why CAPT flipped its vote, to award tenure rather than deny it, after Dr. Pagano's internal appeal.

{¶ 69} The absence of minutes explaining CAPT's reversal supports Dr. Pagano's claim that CWRU did not act in accordance with the Bylaws, which require that minutes be recorded at all committee meetings. The CAPT's final report discussed the committee's negative vote, but only briefly mentioned the reversal

vote in Dr. Pagano's favor after her internal appeal. Subsequent reviewers only had information regarding the negative vote, which supports that CWRU's deviation from proper procedure was not harmless to Dr. Pagano. Whatever happened to change committee members' minds might also have changed the minds of Dr. Davis and subsequent reviewers. The influence of CAPT's negative report is apparent in Dr. Davis's assessment:

> The CAPT review states that Dr. Pagano presents "not the strongest" portfolio in support of tenure. * * * It is quite surprising to me that given the totality of their review, their initial unanimous negative vote, and the lack of new information provided at the appeal, [that] CAPT voted in favor of tenure. I must recommend against the award of tenure.

{¶ 70} In *Galiatsatos v. Univ. of Akron*, 10th Dist. Franklin No. 00AP-1307, 2001 Ohio App. LEXIS 4051 (Sept. 13, 2001), the Tenth District considered whether the school's failure to promptly circulate minutes of the tenure review meeting prejudiced the professor's ability to rebut the school's negative views of his tenure qualifications. Although the trial court found that the professor was substantially prejudiced by the school's breach, the appellate court reversed, finding that despite the breach, the professor was well-aware of the school's general and specific concerns regarding his qualifications. *Galiatsatos* at 20-21.

{¶ 71} Dr. Pagano's claim is different. Dr. Pagano claims that the CAPT's failure to take minutes prevented subsequent reviewers, namely the Dean, Provost, and CWRU's President, from having a thorough explanation for the CAPT's positive vote to award tenure, and left them "with a decidedly negative addendum which did not adequately describe why promotion to tenure was recommended." (Appellant's

brief at 35.) A reasonable jury could find that the failure to record and distribute minutes was not a harmless procedural error and substantially prejudiced Dr. Pagano in the review process.

### 3. Failure to Accurately Identify Dr. Pagano to External Reviewers

{¶ 72} Dr. Pagano also argues that CWRU breached the contract and prejudiced her review by failing to accurately identify Dr. Pagano's position to external reviewers and fairly select qualified reviewers. Dr. Pagano has identified at least one template soliciting an outside review that misidentifies her as a lower-ranked assistant professor instead of the higher-ranked associate professor. The assistant dean for faculty affairs and human resource responsible for mailing the solicitations could not confirm whether the mistake was corrected before mailing. (Deming Dep. 40.) Dr. Pagano has not presented any evidence to support her assertion that letters incorrectly identifying her position were actually mailed. Accordingly, we cannot find a genuine fact issue as to whether Dr. Pagano was prejudiced if CWRU misidentified Dr. Pagano's job title to external reviewers.

{¶ 73} Dr. Pagano also claimed that CWRU failed to reach out to several of the external reviewers she submitted. However, the assistant dean for faculty affairs and human resources swore by affidavit that CWRU reached out to every external reviewer proposed by Dr. Pagano and the department chair to solicit written reviews and recommendations. (Second Deming Aff. at ¶ 4.) She further stated that many of the proposed reviewers did not respond to the request, which required CWRU to reach out to other reviewers. *Id.* at ¶ 5. Dr. Pagano has not presented admissible

evidence to contradict this evidence. We do not find a sufficient evidence of a genuine issue of material fact to avoid summary judgment on this point.

### 4. Use of the President's Advisory Committee ("PAC")

{¶ 74} Dr. Pagano also argues that CWRU's use of the PAC in the review process violates the contract by usurping the role of the Provost and the President. She claims that the Provost and President improperly relied on the PAC's report and recommendation without undertaking their own independent review of her application. CWRU argues that neither the Handbook nor Bylaws prevents the Provost or President from consulting an advisory committee.

{¶ 75} We acknowledge that the PAC is not mentioned in the review process set forth in the contract. However, Dr. Pagano has not presented any evidence that use of the PAC caused the Provost or President to shirk their contractual review duties. To the contrary, the Provost and President both submitted affidavits stating that they conducted independent reviews of Dr. Pagano's application. Thus, we do not find a genuine issue of material fact sufficient to withstand summary judgment.

### 5. Promotion

{¶ 76} Dr. Pagano also argues that CWRU's decision to deny her a promotion was not based on contractual criteria, but on the arbitrary determination that a denial of tenure would be incompatible with a promotion. In support, she refers to the Provost's report, which concluded:

> Promotion to professor in the tenure track without tenure for a faculty member in the final year of the pretenure period would be meaningless and, further, does not meet the criteria defined in the school's standards document.

{¶ 77} CWRU argues that the denial of promotion was based on Dr. Pagano's perceived failure to meet the requisite criteria, which it argues is a protected academic decision. However, considering the Provost's statement and the other procedural irregularities and deficiencies we have discussed, a reasonable jury could find that promotion was denied Dr. Pagano for arbitrary, noncontractual reasons. CWRU is not entitled to summary judgment on this point.

### C. Promissory Estoppel and Breach of Implied Contract

{¶ 78} The parties agree that the Handbook and Bylaws served as the contract in this case. The existence of an express contract precludes a claim of an implied contract and promissory estoppel. *Manno v. St. Felicitas Elementary School*, 161 Ohio App.3d 715, 2005-Ohio-3132, 831 N.E.2d 1071, ¶ 31 (8th Dist.), citing *Cuyahoga Cty. Hosps. v. Price*, 64 Ohio App.3d 410, 416, 581 N.E.2d 1125 (8th Dist.1989), and *Gallant v. Toledo Pub. Schools*, 84 Ohio App.3d 378, 616 N.E.2d 1156 (6th Dist.1992).

{¶ 79} Accordingly, CWRU is entitled to summary judgment on Dr. Pagano's claims for promissory estoppel and breach of an implied contract.

### V. CONCLUSION

{¶ 80} Summary judgment was improperly granted to CWRU on Dr. Pagano's breach of contract claim. However, CWRU was entitled to summary judgment on Dr. Pagano's promissory estoppel and breach of implied contract claims. The trial court's judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

MARY J. BOYLE, A.J., CONCURS;
ANITA LASTER MAYS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE OPINION

ANITA LASTER MAYS, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 81} I agree with the majority that the existence of an express contract precludes a claim of an implied contract and promissory estoppel. *Manno v. St. Felicitas Elementary School*, 161 Ohio App.3d 715, 2005-Ohio-3132, 831 N.E.2d 1071, ¶ 31 (8th Dist.), citing *Cuyahoga Cty. Hosps. v. Price*, 64 Ohio App.3d 410, 416, 581 N.E.2d 1125 (8th Dist.1989), and *Gallant v. Toledo Pub. Schools*, 84 Ohio App.3d 378, 616 N.E.2d 1156 (6th Dist.1992). However, I disagree that CWRU is not entitled to summary judgment on Dr. Pagano's breach of contract claim. Accordingly, I respectfully dissent.

{¶ 82} I would find that no material issues of fact exist regarding CWRU's Faculty Handbook or Bylaws criteria for tenure applications of hybrid scientists as

it applies to Dr. Pagano. I would find that the listed criteria is specific as it applies to all tracks, that the procedure followed was proper and that with the absence of fraud or bad faith, the court should not intervene in CWRU's decision to deny tenure to Dr. Pagano.

{¶ 83} Dr. Pagano's candidacy was subject to a nine-year pretenure period with requisite evaluations conducted at the end of the third and sixth years. Her tenure candidacy was subject to periodic evaluations as required by the Bylaws of the constituent faculty. The evaluations were reviewed by a constituent faculty committee and took into account additional performance data for the review period. The evaluations "address[ed] each of the four criteria for promotion and tenure listed in Section I.F.1" and "[t]he written summary of the evaluations were communicated to the faculty member, the chair, and to the dean of the constituent faculty." *Id.*

{¶ 84} Dr. Pagano states that summary judgment is improper because there are genuine issues of material fact whether CWRU breached the Handbook and Bylaws contractual obligations to develop and follow the proper tenure criteria and process. Dr. Pagano also charges that the trial court's judgment erroneously affords unlimited discretion to CWRU in the tenure process and that the decision ignores that the matter is governed by contract pursuant to *Rehor v. Case W. Res. Univ.*, 43 Ohio St.2d 224, 331 N.E.2d 416 (1975). I disagree.

{¶ 85} In Ohio,

> [A] court should intervene [in promotion and tenure considerations] only where an administration has acted fraudulently, in bad faith, abused its discretion, or where the candidate's constitutional rights have been infringed. This court is not a super administrator concerning the assessment of a candidate's particular qualifications for tenure in the university's Department of Architecture.

*Gogate v. Ohio State Univ.*, 42 Ohio App.3d 220, 226, 537 N.E.2d 690 (10th Dist.1987), citing *Basset v. Cleveland State Univ.*, Court of Claims No. 82-02110 (1982), unreported.

{¶ 86} In other words,

> "[I]t is clear that courts must be vigilant not to intrude into [faculty employment] * * * determination[s], and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges."

*Id.*, quoting *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir.1980).

{¶ 87} "As a general rule, courts must defer to the academic decisions of colleges and universities." *Galiatsatos v. Univ. of Akron*, 10th Dist. Franklin No. 00AP-1307, 2001 Ohio App. LEXIS 4051, at *14 (Sept. 13, 2001). This is true "unless there has been 'such a substantial departure from the accepted academic norms as to demonstrate that the committee or person responsible did not actually exercise professional judgment.'" *Id.*, quoting *Bleicher v. Univ. of Cincinnati College of Med.*, 78 Ohio App.3d 302, 308, 604 N.E.2d 783 (10th Dist.1992).

{¶ 88} A review of the record reveals that Dr. Pagano does not deny that funding is important to research activities as a percentage would cover salary requirements. However, Dr. Pagano argues that each stage of the tenure denial process was improperly focused on a perceived downward funding trajectory for her activities, particularly the failure to receive an R01 federal grant. In her affidavit opposing summary judgment, Dr. Pagano avers that an R01 federal grant is only available to independent, not team or hybrid scientists, though she concedes that it is highly prestigious. Dr. Pagano also complains that the R01 grant is not specifically referenced as a requirement in the Handbook or Bylaws. In addition, Dr. Pagano points out that the term "trajectory" is also absent and appears to be interchangeable with the term "continuing fulfillment" as it relates to ongoing funding obligations.

{¶ 89} CWRU responds that Dr. Pagano has been aware of the importance of R01 federal funding throughout the process and that Dr. Pagano was advised of the option to switch to a nontenure track before the final up and out year but she declined. Dr. Pagano's written three-year pretenure review required by the Handbook and Bylaws emphasized the essential nature of sustained research support and "strongly encouraged" that Dr. Pagano "pursue R01 or equivalent federal funding prior to" the expiration of her National Institute of Health "K[01]-award ending in 2010." As stated in the affidavit of Dean Davis, CWRU views the R01 grant as a prestigious grant subject to a rigorous application process. The grant is deemed "probative of a faculty member's successful commitment to a program of

continuing research and the national or international reputation enjoyed by the candidate."

{¶ 90} The April 13, 2011 six-year review of Dr. Pagano's pretenure period concluded "that the achievement of at least one substantial research award (R01) and continuing evidence of her ability to achieve sustained independent funding will be necessary to her success."   "[I]n the absence of at least one R01 grant, her likelihood of achieving tenure may be restricted."  This information was explicitly communicated to Dr. Pagano.

{¶ 91} On April 6, 2012, Dr. Pagano requested a three-year extension to the spring 2013 for her initial tenure consideration due to challenges that included "advancing my R01 grant funding."  The April 21, 2014 six-year pretenure review report, Dr. Pagano's second six-year review due to the extension, applauded Dr. Pagano's impressive productivity in funding research, teaching, mentoring, and administrative contributions.  "Nevertheless, the concern remains that [Dr. Pagano] has not as of yet achieved an independent R01 or similar federal award as a [pretenure candidate]."  The committee expressed pleasure with Dr. Pagano's accomplishments but "remain[ed] concerned" "that the current limitations of her federal research portfolios may be a barrier to her successful achievement of tenure," and also serves to "emphasize the need for more team collaboration to increase her chances for promotion." *Id.* at p. 2.  Therefore, CWRU communicated its concerns to Dr. Pagano during its early evaluations and carried its compliance of the procedures during her final evaluation.

**{¶ 92}** Thus, the record supports both Dr. Pagano's actual knowledge that the R01 grant acquisition carried great weight and CWRU's procedural compliance with the Handbook and Bylaws. The tenure approval recommendations echo the federal funding concern. The initial report of the departmental committee on promotion and tenure ("DCAPT") reflects a unanimous vote to recommend tenure and promotion. On December 7, 2016, the SOM committee on promotion and tenure ("CAPT") recommended approval of promotion but the denial of tenure. In accord with the Bylaws, through the departmental dean of psychiatry, Dr. Pagano appealed the decision. In January 2017, CAPT issued an addendum to the initial recommendation in response to the appeal.

**{¶ 93}** Pertinent to the R01 issue, three of the CAPT members determined that the $2 million grant awards received by Dr. Pagano placed her on similar footing to many other tenure applications. However, the other members did not feel confident that the history indicated future funding success. The funding ended at the end of the year "and given the lack of NIH funding in over 10 years, the long-term likelihood for [a] NIH award is low." The committee did consider that "Dr. Pagano has been continually funded and has team-based funding lasting until 2019."

**{¶ 94}** The committee cited several other concerns.

> This application tor tenure is not the strongest presented before this committee. Some members worried about the long-term funding on the independent side of the equation, the naivety concerning the editorial board issue, a downward trajectory in terms of grant reviewing, and the negative letters of recommendation. Other

members believed that Dr. Pagano minimally meets the bar set for team-based science (less so for a hybrid model). Her publications are fine, she is a good citizen (service) and seems to be an effective teacher.

This time, six of the nine SOM CAPT committee members voted to award tenure though the previous unanimous approval in favor of promotion remained intact.

{¶ 95} SOM Dean Davis also stated in her affidavit, as documented in Dean Davis's March 7, 2017 letter of recommendation to the provost's office, that Dean Davis agreed with CAPT's recommendation to promote Dr. Pagano to professor, but disagreed with the recommendation to award tenure. Dean Davis determined that "no new substantive information was provided" during the appeal and that "some of the interpretative information * * * appears to have been misleading."

{¶ 96} Citing the Bylaws, Dean Davis explained that achievement of tenure requires "an accelerating and not a declining trajectory of accomplishments." Dean Davis noted that "many of the indicators of professional success have slipped over time" and cited several examples such as a decline in ad hoc invitations from the NIH. Also, of the three editorial board memberships listed, one journal had not been released, the second journal had just released the second issue, and Dr. Pagano's position with the third publication was not the position identified by Dr. Pagano. Dean Davis was also concerned that the papers published prior to 2006 as compared to those published between 2010 to 2017 indicated a "declining impact of [Dr. Pagano's] publications within her field."

{¶ 97} Pertinent to the funding issue, Dean Davis addressed the second area of concern. "[B]ecause research in biomedicine is expensive and requires funding,

the candidate should present convincing evidence that she can continue to support her work, either by individual or by team science grant mechanisms." Dean Davis rejected the position that the $2 million grants secured by Dr. Pagano were R01 equivalents and stated that those grants had "been nearly the sole extramural source of support for Dr. Pagano's research" since 2009 and noted that the grant ends in 2017. "[Dr. Pagano's] major funding is ending with no replacement in sight." Also, "[i]n biomedicine, research is costly and requires research assistance, record storage, and so on." "[W]ithout funds, it is not possible for the university to 'foresee for him or her continued fulfillment of the qualifications listed above' as is expected for tenure in our bylaws."

{¶ 98} Dean Davis also explained that R01 grants were much more competitive than the grants secured by Dr. Pagano. In addition, Dean Davis stated, "the department CAPT cautioned that the absence of federal funding would pose a barrier, perhaps insurmountable, to the award of tenure, so Dr. Pagano has had this feedback for a considerable time."

{¶ 99} Dean Davis concluded:

> The CAPT review states that Dr. Pagano presents "not the strongest" portfolio in support of tenure. Dr. Pagano's record does not support a sustainable research plan either as an independent scientist or a team scientist. Particularly, she has not clearly established an upward career trajectory or a record that indicates future success in funding her research. Three of her external referees express skepticism that she would achieve tenure and promotion at their institutions, pointing to her lack of federal funding, publication in what they consider to be marginal journals, the lack of national service as a full member of study sections or major editorial boards, and few major national addresses, it is unusual for any referee recommended by the department to question

the promotion, let alone three of them. The referees who are known to me personally and whom I most respect did not recommend tenure. It is quite surprising to me that given the totality of their review, their initial unanimous negative vote, and the lack of new information provided at the appeal, the CAPT voted in favor of tenure. I must recommend against the award of tenure.

{¶ 100} The recommendation also advises that the "Faculty Council Steering Committee has reviewed the recommendation to ensure that equality in standards has been applied in the assessment." "The appropriate support documents are enclosed for your consideration and review."

{¶ 101} Finally, there is the May 3, 2017 recommendation from Provost Baeslack to CWRU President Snyder. The recommendation capsulizes the preceding recommendations and advises that the case was reviewed at the April 4, 2017 meeting of the president's advisory committee ("PAC").[1]

{¶ 102} "The committee found this an unusual case in that promotion to the rank of professor in the tenure track is incompatible with a negative decision on tenure in the final year of the pretenure period." The PAC echoed several of the areas of concern expressed by Dean Davis.

{¶ 103} The PAC also noted that the advisory committee opinions were "widely divergent" "where a minority would recommend both promotion and tenure."

> There was, however, consensus that promotion to professor without tenure in the final year of the pretenure period would be incompatible with school promotion and tenure guidelines that expect "sustained

---

[1] Dr. Pagano argues that the PAC review constitutes a breach of the Handbook and Bylaws because it is not a listed part of the process. CWRU responds that the PAC's advisory report is informational and not determinative.

excellence, enhanced recognition for research contributions, and a national or international reputation" for promotion to professor that would follow (or in this case be concurrent with) the achievement of tenure "awarded to productive independent investigators who have engaged in substantial research activity that is recognized nationally or internationally, as evidenced by a substantial list of first or senior-authored, high quality, peer-reviewed publications in high quality, peer-reviewed journals."

{¶ 104} The recommendation concluded:

After careful consideration, the majority of the advisory body recommends against promotion and against tenure. The votes averaged 1.38 on promotion and 1.00 on tenure a scale of 3 to 0 where 0 means definitely do not promote or tenure and 1 means probably do not promote or tenure.

Lynn Singer [deputy provost] and I have reviewed the file and recommend that neither promotion nor tenure be awarded. Promotion to professor in the tenure track without tenure for a faculty member in the final year of the pretenure period would be meaningless and, further, does not meet the criteria defined in the school's standards document.

President Snyder concurred by signature on the report, "[a]greed no to promotion no to tenure."

{¶ 105} Dr. Pagano cites other concerns with the process such as that the committee notes served as meeting minutes for some stages and the conclusions, recommendations, and information upon which the findings were based. As a result of my review of the Handbook, Bylaws, and process, I do not find that CWRU breached the contract or that "there has been 'such a substantial departure from the accepted academic norms as to demonstrate that the committee[s] or person[s] responsible did not actually exercise professional judgment.'" *Galiatsatos*, 10th Dist.

Franklin No. 00AP-1307, 2001 Ohio App. LEXIS 4051, 14 (Sept. 13, 2001), quoting *Bleicher*, 78 Ohio App. 3d 302, 308, 604 N.E.2d 783.

{¶ 106} I find that, when construed in a light most favorable to the nonmoving party, the trial court's grant of summary judgment was not an abuse of discretion.